## COCA COLA BOTTLING WORKS v. J. C. LEWIS.

Middle Section.   December 31, 1928.

Petition for Certiorari denied by Supreme Court, April 13, 1929.

Avery Handly, of Nashville, for plaintiff in error.

James A. Newman and Harry A. Luck, of Nashville, for defendant in error.

FAW, P. J. The defendant in error, J. C. Lewis (hereinafter called plaintiff), sued the plaintiff in error Coca Cola Bottling Works, a corporation (hereinafter called defendant), in the circuit court of Davidson county and obtained the verdict of a jury, and judgment of the court thereon, for $1000, from which judgment, after its motion for a new trial had been overruled, the defendant prayed an appeal in the nature of a writ of error to this court, which was granted by the trial court and perfected by the defendant.

At the close of all the evidence, on the trial below, the defendant moved the court to peremptorily direct the jury to return a verdict for the defendant, but this motion was overruled and the case was submitted to the jury for the determination of the issues made by defendant's plea of not guilty to plaintiff's declaration, with the result before stated.

Through its first and second assignments of error, defendant asserts that (1) the trial court erred in overruling its motion for a directed verdict, and (2) there is no evidence to sustain the verdict of the jury. These assignments of error may be considered together, for if there was evidence which made it necessary to submit the case to the jury for its verdict, there is evidence to support a verdict for the plaintiff.

The plaintiff's declaration contains but one count, which is as follows:

"The plaintiff, J. C. Lewis, sues the defendant Coca Cola Bottling Works, a corporation duly organized and chartered under the laws of Tennessee, for Five Thousand ($5000) Dollars damages, and for cause says:

"That heretofore, to-wit on or about June 14, 1927, and for several years prior thereto, defendant was engaged in preparing, bottling and selling in sealed bottles a certain beverage intended for human consumption, advertised and recommended by defendant to the public as a healthful, invigorating beverage suit-

able to be drunk freely by human beings and known by the trade name of 'Coca Cola.'

"That it was the duty of defendant to exercise a high degree of care to see and know that the bottles into which said beverage was put and sealed were properly cleaned and sterilized and that the beverage itself was clean and wholesome and free from all impurities and deleterious substances.

"That some time prior to the date aforesaid the defendant, through its servants and agents, with full knowledge and with the intent and purpose that its produce would be sold and consumed by some person, and with a reckless disregard of its duty, wrongfully and negligently sealed up in a bottle of Coca Cola some dirty, filthy and deleterious substance, and sent, or permitted said bottle to be sent out to the trade in the ordinary course of its business to be sold and consumed by some one of the public as a healthful, invigorating beverage, and on or about the date aforesaid, plaintiff, while in the exercise of due care and caution, purchased from a dealer therein to whom same had been delivered by defendant, as aforesaid, said sealed bottle of Coca Cola which contained said dirty, filthy and deleterious substance and drank thereof without a knowledge of the contents of said bottle, within a few moments thereafter and as a result of taking into his stomach a portion of the contents of said bottle, plaintiff became deathly sick and nauseated, and because thereof was forced to abandon his work and employment and be carried to his home, where he continued for several days to suffer great pain and mental anguish and still suffers as a result thereof, and plaintiff was confined to his room and bed for — days, lost much valuable time and was forced to expend large sums of money, to-wit: $— for medicine and doctor's bills in an effort to be cured, and all because of the wilful, wrongful and negligent acts and conduct of defendant, its servants and agents, in sealing up and sending out said bottle of coca cola containing said dirty, filthy and deleterious substance as aforesaid, whereby plaintiff has been injured and suffered damages in the sum of $5000. Wherefore he sues and demands a jury to try the issues joined."

Resolving all conflicts of evidence in favor of the plaintiff and viewing the evidence in the light most favorable to the plaintiff of which it is reasonably susceptible, the facts which will now be stated are disclosed by the record.

The defendant, Coca Cola Bottling Works, is a corporation operating a bottling plant in the City of Nashville, Tennessee, with the sole and exclusive right to bottle, sell and distribute the beverage known as coca cola within the territorial limits of Davidson county,

Tennessee, and was so engaged in the month of June, 1927, at which time the plaintiff, J. C. Lewis, bought a bottle of coca cola from the witness James Dugan, in the manner hereinafter more particularly described, and defendant was also engaged in the same business and in the same territory at other times when witnesses for the plaintiff made the purchases of coca cola about which they testify in this record.

At the time of the transaction involved in this case the plaintiff was employed as a night watchman at the Cumberland Hosiery Mills in West Nashville, and was at that time about fifty-three years of age. On the night of June 14, 1927, while plaintiff was on duty in his capacity of night watchman as aforesaid and between seven and nine o'clock in the evening, he bought a bottle of coca cola from James Dugan at the grocery store of Dugan which was situated directly across the street from the plant at which plaintiff was employed. About the same time, plaintiff purchased a sandwich from one O. E. McAdams who conducted a restaurant a short distance from plaintiff's place of employment, and took the sandwich and coca cola back to the office of the Cumberland Hosiery Mills and there opened the bottle of coca cola, took a "bite" from the sandwich and drank a "swallow" of the coca cola, and immediately became very sick and greatly nauseated. As soon as plaintiff became nauseated, he went out on the porch connected with the office and called to Mr. Dugan, from whom he had bought the coca cola, and who was in the act of leaving his store at the time. Mr. Dugan immediately went across the street to the porch where plaintiff was sick and vomiting, and, after inquiring of plaintiff as to his condition and the cause thereof, he (Dugan) examined the sandwich and the coca cola and ascertained that the bottle from which plaintiff had taken a drink contained some foreign substance in the coca cola.

Plaintiff testified that when he took the swallow of coca cola from the bottle in question he "smelt a curious odor" and "began to turn sick" and "inside of a minute" he had to "nearly run out on the porch and was vomiting" for probably two hours. When plaintiff first became nauseated he thought that the sandwich had made him sick, and he asked Mr. Dugan to send for Mr. McAdams, from whom plaintiff had bought the sandwich. Mr. McAdams came, but just before he reached the office where Dugan was examining the coca cola and the sandwich, Dugan discovered a foreign substance in the coca cola bottle. The son of plaintiff ate the remainder of the sandwich during the same evening and suffered no ill effects therefrom, and there is other evidence of a convincing character to the effect that the piece of meat and loaf of bread from which the sandwich had been made were sound and wholesome.

James Dugan took charge of the coca cola bottle from which plaintiff had taken a swallow and kept the same, with its remaining contents, in his possession until he delivered it to one of the attorneys of record for plaintiff, and Dugan identified the bottle put in evidence on the trial as the same bottle sold by him to plaintiff under the circumstances before stated. Dugan also testified that the contents of the bottle were to all appearances the same as they were when he inspected the bottle immediately after plaintiff became sick as aforesaid.

It appears from plaintiff's testimony that he suffered intense pain, had a physician attending him, and lost about ten days from his work, as a result of the illness following the drinking of the swallow from the coca cola bottle as before stated.

It appears that the witness Dugan was in the habit of selling coca cola at retail at his grocery store; that he was accustomed to keep it in an ice box at his place of business; that during the afternoon immediately preceding the night on which plaintiff drank the coca cola as stated, and about three o'clock on that afternoon, Dugan discovered that he was out of coca cola and he called the defendant's bottling plant over the telephone, and soon thereafter received a "delivery" of coca cola direct from defendant's plant, which was brought to Dugan's store by the witness F. H. Redmond, an employee and salesman of the defendant. Immediately upon the receipt of this consignment of coca cola, Dugan took some of the bottles from the case and placed them in his ice box, and he testified that not a single bottle was taken out or sold therefrom until the plaintiff called and made the purchase before mentiond from him, and that he took the bottle from the ice box and handed it to plaintiff. Dugan stated that from the time the bottle was received by him from Redmond until it was delivered to plaintiff, it was not opened or tampered with in any manner, and that it was delivered to plaintiff in the same condition in which it was received by him (Dugan) from the defendant's salesman, Redmond.

Redmond also testified that the coca cola delivered by him to Dugan as aforesaid was carried by him (Redmond) direct from the company's plant to Dugan's store without being opened or tampered with in any manner.

There is also in the record certain undisputed testimony on behalf of defendant with respect to the method of operation of defendant's bottling plant, which testimony it is proper to state.

The bottling plant of the defendant is situated on Church street in the City of Nashville and was specially built in August, 1926, for the purpose of bottling coca cola, and is so arranged that the process of cleaning the bottles and bottling the coca cola, which is mechanical throughout, may be seen through large windows by persons passing the plant.

The process of cleaning the bottles and bottling coca cola as conducted in defendant's plant is described in the testimony of E. F. Judd, defendant's "production manager," as follows:

"Q. Just explain to the jury what that process is. What do you do, in bottling coca cola? A. We get the syrup from the Coca Cola Company, it comes to us in barrels.

"Q. That is in Atlanta? A. That is in Atlanta. It is put into what we call our syrup room. The syrup is dumped into a five hundred gallon glass-lined tank, what we call a syrup tank. It goes into the filling machine through a block tin pipe. The bottles, when they come in from the street, they put them on the washing machine, on conveyors, and there are two people that take the bottle up, put it in these chains—the washing machine consists of an endless chain that travels through this all the time.

"Q. How are they put on the chain? A. They are put on the chain, this chain consists of little cups and these bottles are put on this cup inclined down.

"Q. You mean inverted? A. Inverted, yes, sir.

"Q. What is done? A. This chain is made out of little cups that that bottle sets in upside down, and it travels through this washing machine, and takes twenty-three streams of water from the time it goes into this soaker solution until it comes out before it is rinsed.

"Q. You mention soaker solution, what is that? A. It consists of water, with a four per cent solution of caustic soda.

"Q. Now, this caustic soda, what does that do? A. It absolutely cleans the dirt and will kill any germ that it comes in contact with in washing the bottles.

"Q. Is that from the chemical analysis? A. That is from the chemical analysis of the A. B. C. Research.

"Q. What do you mean by the A. B. C. Research? A. That is a research by the American Bottlers of Carbonated Beverages, where they have these chemical tests of things, all the bottlers do, and try out before they put them into use.

"Q. So it passes through this solution, and then through the jets, what is that? A. In this washing machine there is twenty-three wheels, and these wheels have cogs on them that these caps fit around, on each of these wheels there is a steel jet that a stream of water goes up into that bottle as it goes over this steel jet twenty-three different times, the stream of water goes in there under a pressure of from twenty-five pounds with the bottle inverted or upside down.

"Q. Then what is done? A. It stays in there nine minutes; it gets the actual stream of this hot water for nine minutes.

"Q. Is that mechanical? A. It is by machinery, yes, sir.

"Q. There is no opportunity for human—

"MR. LUCK: Wait a minute, let him describe it.

"MR. HANDLY: You won't let me lead him?

"MR. LUCK: No, sir.

"A. This soaking machine is encased in a steel case; these wheels are inside this case; you cannot put your hand in this case to put anything in those bottles, because you cannot put your hands in this caustic solution that these bottles are washed with, if you do you draw it back with part of the skin gone. It is in that stream of water nine minutes.

"MR. HANDLY: Q. You mean one stream? A. No, sir, it gets twenty-three streams of water, direct jets, during this nine minutes it gets twenty-three streams of water, and it is under the stream for the nine minutes; it takes a bottle about seventeen minutes to go through the washing machine.

"Q. You say the bottles; do you mean every bottle that you fill has gone through this process? A. Every bottle that we fill has gone through this washing machine.

"Q. And it is done mechanically? A. It is done mechanically, and it comes out of the caustic solution and gets three jets that give it what we call a thermal rinsing of warm water, it gets three rinses of warm water.

"Q. Is that caustic, or is that clear? A. Clear water, after it passes through those three rinses, it goes around a wheel with jets on it, and gets rinsing of city water just like you drink it out of the faucet from the hydrant, but it gets eleven seconds rinsing with city water.

"Q. What is the purpose of that, to rinse the caustic out? A. To rinse the caustic out and clear the bottle, and so as to cool the bottle so it won't warm the syrup; it travels from this rinsing down to the unloader to a piece of machinery that goes down to this device that lifts this bottle off of the chain and sets them upright on a conveyor, they are not touched by hand, but put on there by machinery.

"Q. You mean it is turned by machinery? A. It is turned by machinery, it gets on this conveyor, and it travels for a distance in order to dry, about twenty-four inches, right in front of three electric lights.

"Q. What kind of electric lights are they? A. They are seventy-five watt lights.

"Q. Are they high powered lights? A. Yes, sir. In behind those three lights, there is a light that goes over in back of them and reflects the light right into this stream of bottles in front of this twenty-four inches, in front of this conveyor there is a

492

girl sitting right in front of these bottles, and sees every bottle pass by those three lights and gives it an inspection until it travels twenty-four inches right in front of her, it passes this light and goes on this syruping machine and passes out automatically without being touched by hand.

"Q. This syrup machine puts in so much coca cola syrup? A. One ounce of coca cola syrup.

"Q. Is that done mechanically? A. That is done mechanically, not touched by hand.

"Q. How does that syrup come, from what to the bottles? A. It comes out of these glass-lined syrup tanks, and they are of block tin, on a syrup machine which holds about a gallon and a half or two gallons of syrup and is silver-plated.

"Q. As it goes into the bottle, what is it? A. It goes into the top, as this bottle ranges up through the syrup machine goes down into this bottle about three or four inches and the syrup comes out of an 1/8 inch tube right into the bottle.

"Q. What strainer, if any, have you? A. Before the syrup gets into the tank, it goes through 3/1000 of an inch wire mesh galvanized screen copper.

"Q. What do you mean by copper? A. One hundred strands to the inch.

"Q. What size wire? A. Small wire. That is what they call it, one hundred gauge wire, it takes one hundred of them to make the space of an inch.

"Q. Well, is that of such construction of fine wires as to keep out anything? A. It will keep out any foreign substance.

"Q. Whatever it is? A. Just like you strain milk, if you know what that is, in a milk strainer when you strain your milk.

"Q. And those are double strainers? A. Yes, sir, just like the milk strainer, and after it gets this one ounce of syrup in this bottle it passes on to this filling machine and this filling machine puts five and a half ounces of carbonated water, that is, it is plain soda water which comes into the plant, that is filtered.

"Q. What kind of filter have you? A. A sand and gravel filter, an International filter, we put the water that comes from the city like you drink it here, we filter it again, and it goes into this filling machine with three and a half volumes of gas in it, carbonated soda gas, what the chemists call $CO_2$, three hundred and two, and it is three and a half volumes of this gas with three and a half ounces of water, it comes off of this filling machine, not touched by hand, and it goes under the crowner, and the crowns are put on it there.

"Q. Is that done mechanically? A. Thtat is done mechanically, by a piece of machinery.

"Q. Have you got any of those caps here? A. None except what is on these bottles.

"Q. Is that the way it is crowned, is that what you called crowned? A. That is the way it is crowned. That is, that bottle has been crowned with a machine and it comes off of this crowner, it goes on to another conveyor, and that carries it to what we call the accumulative table.

"Q. That is for packing it? A. That is for packing it, that is it is double, two girls stand there, each one of those has a box, a square box about like that square with a light down in it, and we have a seventy-five watt electric light in this box.

"Q. You mean that is another inspection? A. Another inspection on the top of this box there is a four split, in other words, four cracks, that the reflection of the light come up in this bottle, this bottle lies that way, there are two girls stand there and take those bottles off the table and lay them like this.

"Q. That is after they have been sealed? A. Yes, sir, that is after they have been sealed, they inspect them and put them on a conveyor right by the side of them, and they go on to our storage and out into the trade.

"Q. In the cases? A. Yes, sir.

"Q. Now, as I understand you, except for the inspection behind the lights, that is the only human agency that comes in from the beginning of the washing until the capping and putting away? A. They are not touched by hand until they go between this space of twenty-four inches with nothing in front of or behind them but the light.

"Q. Machinery does it all except the human eye? A. Except the human eye inspecting it.

"Q. You say you have been under this association to the other plants you have named; is that, in those cities you have named, the process the Coca Cola Bottling Works use? A. Yes, sir, that is the process that the coca cola bottlers use; some plants do not have inspection of the bottle before it is filled because they do not think it is necessary, but we usually inspect them before and after it is filled, that extra precaution that some bottlers do not use but one.

"Q. You have had this experience since 1917? A. I have had this experience since 1917.

"Q. Is that the highest degree of the art in this country? A. That is what is known to us as the best and highest degree of bottling that we have been able to get up.

"Q. Now, as you have heard described here by the others, can a cap be put back on after it is opened?' A. Yes, sir, it can be put back.

"Q. It can be put back by hand? A. Yes, sir.

"Q. Do you sell to the trade direct, or do you sell to the retailers? A. We sell to the retail grocery stores, that is the merchants, soda fountains, cafes and little restaurants.

"Q. You do not sell direct to the consumer? A. We sell to private homes.

"Q. If you get a case order, you sell? A. Yes, sir, by the case.

"Q. I mean you do not run a place where it is sold? A. No, sir, we do not sell anything less than a case.

"Q. Now, Mr. Judd, you heard Dr. Cullom state that he came down to your plant after this particular claim arose? A. Yes, sir.

"Q. Now, did he inform you how long he had been waiting on the plaintiff here at that time? A. He had the night before, I suppose it was the second day after Mr. Lewis was said to have taken sick, I don't remember exactly whether the first or second day, but anyhow Dr. Cullom came to me and explained to me.

"Q. What did he ask you? A. He asked me if we would not guarantee his bill to Mr. Lewis?

"Q. What did you tell him? A. I told him no that we would not guarantee his doctor's bill, and I took Dr. Cullom out in the plant and showed him our process of bottling.

"Q. Now, this new building that you put there have you got that so it can be even seen from the street, the whole process? A. It can be seen from the street the whole process, the machinery sets back from the window and you can stand on the street and look in the windows and see the process.

"Q. Was it built that way as a kind of exhibition or demonstration? A. In other words, as a kind of advertising that we get out of it showing how clean they are bottled.

"Q. Are those machines kept clean? A. Yes, sir, they are all kept clean. Each machine is absolutely sterilized. In the afternoon hot water is run from the tank and they are steamed out every afternoon after we quit bottling, a week day run.

"Q. And the inspectors are kept in charge? A. Yes, sir, and we invite people to come in and see the process, and they are glad to come in and look at it."

It is also shown by undisputed proof that the metal caps on the coca cola bottles can be easily removed and put back without changing the external appearance or condition of the bottle or cap.

The plaintiff was permitted to prove by the witnesses James Dugan, J. B. Lewis and C. W. Marr some other instances where bottles of coca cola bought in Davidson county contained foreign matter of a filthy character, such as bugs, a decomposed mouse, and another of a nauseating character which will not be more particularly described.

The general rules of law which must govern this case will be found in published opinions in the cases of Boyd v. Coca Cola Bottling Works, 132 Tenn., 23, 177 S. W., 80; Crigger v. Coca Cola Bottling Company, 132 Tenn., 545, 179 S. W., 151, L. R. A., 1916-B 877, A. & E. Anno. Cas. 1917-B 572, 11 N. C. C. A., 359; Coca Cola Bottling Works v. Selvidge, 4 Tenn. App. R., 558.

These rules are summarized in Crigger v. Coca Cola Bottling Company, supra (at page 552), as follows:

"1. That one who prepares and puts on the market, in bottles, or sealed packages, foods, drugs, beverages, medicines, or articles inherently dangerous owes a high duty to the public, in the care and preparation of such commodities, and that a liability will exist regardless of privity of contract to any one injured for a failure to properly safeguard and perform that duty.

"2. This liability is based on an omission of duty or an act of negligence, and the way should be left open for the innocent to escape. However exacting the duty or high the degree of care to furnish pure foods, beverages, and medicines, we believe with Judge Cooley, as expressed in Brown v. Marshall, supra, that negligence is a necessary element in the right of action, and the better authorities have not gone so far as to dispense with actual negligence as a prerequisite to the liability. In fact, there is no logical basis of liability for personal injury without some negligent act or omission."

In the instant case, there was evidence from which the jury could find that the foreign substance which made plaintiff sick was not put in the bottle after it was delivered by defendant's agent, Redmond, to Dugan, the grocer, who sold it to the plaintiff. It thus appearing that the foreign matter was in the bottle when it left the custody of defendant, it was, in view of "the high duty resting on the defendant," and in the absence of other explanation, within the province of the jury to infer that defendant was negligent in placing on the market a bottle thus contaminated. Defendant's first and second assignments of error are therefore overruled.

Defendant's assignments of error numbered three to eleven inclusive, relate to the admission of testimony over the defendant's objection, and the most important of these assignments are the sixth, ninth and tenth, through which defendant directly challenges the ruling of the trial court in admitting over defendant's objection the testimony of witnesses to the effect that foreign substances of a filthy

character, unfit for human consumption, had on other occasions been found by other persons in bottles of coca cola.

The sixth assignment questions the admissibility of certain testimony of the plaintiff's witness James Dugan, as follows:

"Q. Now, Mr. Dugan, did you ever discover any foreign substance or have your attention called to any foreign substances in bottles of coca cola that you had received from this defendant, prior to this time? A. Yes, sir.

"Q. Now, what were they? A. Well, the first one that I had my attention called to was a bottle of coca cola that had a dozen, some ten or fifteen—I never counted them—small bugs or worms about 3/8 of an inch long, I never saw any like them before, sharp at both ends, and fuzzy."

On cross-examination the witness Dugan testified further with reference to the incident just mentioned, as follows:

"Q. Mr. Redmond, when was it that you saw the bugs or worms? A. Mr. Dugan, you mean.

"Q. Yes, I beg your pardon, Mr. Dugan, when was it? A. Well, sir, I could not give the exact date; it was something like eighteen or twenty months ago.

"Q. And now did you examine the bugs or worms, or just look at it in the bottle? A. I just looked at it.

"Q. Now, didn't somebody tell you to look at it, to look at that bottle, or was that one of your bottles?" A. It was one of my bottles, that I had sold, carried it over to the Harrison family, and I brought it straight to my grocery. I delivered it over there and after I delivered it they called me back from my place of business and I went over there and they said 'There is bugs in this bottle.'

"Q. And you went over to see it? A. Yes, sir, I went over to see it, and put another bottle in the place of it."

The ninth assignment is directed to the testimony of J. B. Lewis, who testified that he bought a bottle of coca cola from Mr. Andrews at a lunch stand on the Dickerson Pike about eight miles from Nashville, and that he found a mouse inside the bottle. We quote from the testimony of J. B. Lewis as follows:

"Q. When was that, Mr. Lewis? A. I couldn't give you the exact date.

"Q. Well about? A. It was about the 8th, as I remember, of June, 1926.

"Q. June 8th, 1926? A. Approximately.

"Q. Did you drink any of that bottle that you bought? A. Yes, sir, I drank nearly half of it.

"Q. Did it make you sick? A. Yes, sir.

"Q. Did you then look in the bottle? A. Yes, sir.

"Q. Examine it? A. Yes, sir.

"Q. What was it? A. It was a small mouse about that long.

"MR. HANDLY: Let him indicate how long it was, I didn't see.

"MR. LUCK: Q. How long did you say it was?

"MR. HANDLY: In inches? A. I would say two and a quarter inches.

"MR. LUCK: Q. Was it decomposed, or not? A. It seemed to be; I didn't have very much time to investigate.

"MR. HANDLY: I object to that as an opinion.

"MR. LUCK: Q. Just give the jury the appearance of the mouse with reference to its physical condition. A. It looked like it was very much decomposed, while it was still intact, there was a lot of accumulated vapors about it, and it looked very much as if it was decomposed, very much so.

"MR. HANDLY: Of course I insist on my exception.

"THE COURT: You can cross-examine subject to your exception, of course, without waiving your exception."

On cross-examination, J. B. Lewis stated that he had sued for damages and his case was still pending.

The tenth assignment questions the admissibility of the testimony of plaintiff's witness C. W. Marr, who testified that, on July 27, 1927, he bought a bottle of coca cola from Rice Brothers, at their place of business on Woodland Street, in Nashville, and found in it an article of a very offensive and nauseating character, which the witness described, but which description we will omit.

It also appeared from the testimony of the witness Marr that he then had a pending suit based on the incident related in his testimony as aforesaid.

It was stipulated by counsel on the trial "that the coca cola Bottling Works has the exclusive right to sell coca cola within the limits of Davidson county, and bottled coca cola was sold only by the defendant in said county during the time of the sales herein or referred to in this record."

It is obvious that the testimony we have quoted introduced collateral issues into the case, of which issues defendant had no notice by the pleadings. The evidence thus elicited from the witnesses was of a nature which would naturally tend to prejudice the defendant's case in the minds of the jury.

The general rule which excludes evidence of independent acts or instances similar to that involved in the case on trial is based not only on the theory that the admission of such evidence would permit the introduction of collateral issues whereby the attention of the jury may be diverted from the main question, but "an additional

purpose of the rule is to prevent surprise of a litigant, or the subjection of a party to the necessity of meeting evidence possibly prejudicial, and the character of which he has no means of anticipating.'' 2 Jones on Evidence (2 Ed.), sec. 588, p. 1087; Massengill v. Shadden, 1 Heisk. 357, 359; Decherd v. Morrison, 2 Swan 304, 306; Franklin v. Franklin, 90 Tenn. 44, 49, 16 S. W. 557.

In the course of their written argument (combating the assignment we are now discussing), plaintiff's counsel say:

"It must be conceded as true that ordinarily separate acts of negligence and testimony with reference thereto will not be admitted in a given case for the reason that the circumstances and the facts may not combine in such way as to present the same condition as exists in the given case, and we therefore think would not either be relevant or material, but on the other hand when the direct proposition involved is a method in mechanical device or a given process a different question is presented and other acts of negligence involving faulty operation of the method in process, are competent to show the defect therein."

The fallacy in the proposition just stated, as we see it, is that it does not take into account the opportunity which "malevolent persons" had to open the bottles and put foreign substances into them after they left defendant's bottling works. (Crigger v. Bottling Company, supra, p. 553). With respect to the bottle from which plaintiff Lewis drank, the testimony of plaintiff and James Dugan tended to negative the probability of such tampering with the bottle, but there is no such evidence concerning the bottles about which J. B. Lewis and C. W. Marr testified and the bottle which Dugan sold to the "Harrison family."

We do not think the case of Davis v. Van Camp Packing Co. (Iowa), 17 A. L. R., 649 (176 N. W. 382), is in point. The theory on which the plaintiff in that case based his action was that he had suffered from ptomaine poisoning as a result of eating "pork and beans" which had been canned and placed on the market by the defendant there sued. In that case the court said: "Appellant contends that the court erred in excluding evidence of other defective cans of beans. If the evidence is connected up so as to show that the offered evidence had reference to purchases out of the same consignment or batch, we see no reason why the evidence is not admissible. It is not necessarily evidence of other acts of negligence. We think it has a bearing on the question of negligence."

The distinction between the case of Davis v. Van Camp Packing Co., supra, and the case at bar is apparent. Manifestly the testimony challenged by the defendant's sixth, ninth and tenth assignments of error tends to show other and independent acts of negligence, and the ruling in Davis v. Van Camp Packing Company affords

no authority for its admission. These three assignments of error are sustained.

The fifth, seventh, eighth and eleventh assignments of error are subsidiary to the sixth, ninth and tenth assignments, or to one or more of the last-mentioned three assignments, and do not require separate consideration.

Through its third assignment, the defendant says that the trial court erred in admitting, over defendant's objection, certain testimony of Dr. J. M. Cullom, as follows:

"Q. This man, as you saw him, on the night that he was brought there to the office, assuming that he drank from the contents of that bottle, and it made him sick, what would you say if he had drank the whole bottle? A. Well, in proportion to the way he was from drinking that little, taking into consideration the character of the thing that caused it, if he had drank the whole bottle—it would have killed him."

And through its fourth assignment, the defendant says that the comments of the trial judge, when ruling upon the objection to the above quoted testimony of Dr. Cullom, were improper, and were prejudicial to the defendant. The "comments" of the trial judge, which are thus criticized, were as follows:

"In view of the fact that it is a well known fact—I might as well state in the presence of the jury as anywhere else, it is a fact they are put up in bottles of that size, and as well known when a man buys one he drinks it all, usually, and the manufacturer of it evidently intended that that to be a dose for a man, to satisfy his thirst for coca cola, he has one drink, intended that he drink that much when they packed it and sold it, I reckon they would have a right to show what a full dose, a full bottle—what effect a full bottle would have, and while he did not drink a full bottle, he has got a right to lead up to that effect by the proportion of the bottle that he did drink, the effects of the small quantity that he did drink. Go ahead and answer the question."

We are impressed with the thought that, in the absence of an analysis of the contents of the bottle in question, the above quoted testimony of Dr. Cullom was merely the expression of an opinion which was so far tinctured with conjecture, even for a medical expert, as, in strictness, to be incompetent. However, we do not think it could have affected the result of the trial, and, therefore, does not constitute reversible error. Acts of 1911, Ch. 32.

The twelfth assignment of error is that, in his charge to the jury, the trial judge "overemphasized the plaintiff's theory." We are of the opinion that there is no substance in this assignment.

In its thirteenth assignment, the defendant says that the trial court erred in charging the jury as follows:

"You will bear in mind, gentlemen, that negligence on the part of the defendant cannot be assumed from the mere fact that the plaintiff was made sick, as negligence must be proved before the defendant can be made liable in this case. But negligence, like any other fact, may be proven by circumstances, so you are instructed to take into consideration all of the facts and circumstances connected with the method of cleaning and filling bottles at the defendant's plant, the opportunity or want of opportunity, the care or want of opportunity, the care or want of care, of the young ladies, inspectors, to detect or see the substance complained of in said bottles as it passed between their eyes and the electric lights along with other bottles in the time permitted for such inspection.

"You should also consider the evidence of those witnesses who testify to other instances of defendant's coca cola bottles containing foul matter; but such consideration should be confined to the efficacy or want of efficacy in the defendant's system of cleaning said bottles, and at the same time you should also consider the motives and opportunities of the persons through whose hands these other foul bottles had passed for putting such filthy substances into same after they had been sealed up and put on the market by the defendant.

"In other words, gentlemen, you should carefully, and in a common-sense way try to determine from all the facts and circumstances connected with this case as shown by all the evidence, whose fault it was that the alleged foul and filthy or unhealthy substance came to be put into the bottles of coca cola complained of in this case, and if you should find from a preponderance of all the evidence, including all of the material facts and circumstances of the case that it was the defendant's fault, then the defendant would be liable."

It follows from what we have heretofore said (in disposing of the sixth, ninth and tenth assignments of error) with respect to the admission of "the evidence of those witnesses who testify to other instances of the defendants' coca cola bottles containing foul matter" that the above charge as to the consideration of such testimony by the jury was erroneous, and was prejudicial to the defendant, and the thirteenth assignment of error will be sustained.

It is also said for defendant that, in that part of the charge above quoted, the court assumed, as an established fact, that there was a foreign substance in the bottle in question, and thus invaded the province of the jury; but when the entire charge is read we do not think the jury was misled in this particular.

As the case must be remanded for another trial, we will refrain from comment on the fourteenth and fifteenth assignments of error,

through which defendant asserts that the amount of the verdict is excessive.

It results that the first, second, third, fourth and twelfth assignments of error are overruled; but the sixth, ninth, tenth and thirteenth assignments are sustained; and for the errors pointed out by the last mentioned four assignments of error the judgment is reversed, the verdict of the jury is set aside, and the cause will be remanded to the circuit court of Davidson county for a new trial.

The costs of the appeal will be adjudged against the plaintiff Lewis. The costs accrued in the circuit court will abide the future adjudication of that court.

Crownover and DeWitt, JJ., concur.