COCA-COLA BOTTLING COMPANY, Plaintiff in Error, v. MRS. H. E. ROWLAND, Defendant in Error.

Western Section. December 19, 1932.

Petition for Certiorari denied by Supreme Court, May 20, 1933.

E. B. Klewer, and Holmes, Canale, Loch & Glankler, all of Memphis, for plaintiff in error.

Fitzhugh, Murrah & Fitzhugh, of Memphis, for defendant in error.

SENTER, J. This is a suit for damages brought by plaintiff below (Mrs. H. E. Rowland who will hereinafter be referred to as plaintiff) against the Coca-Cola Bottling Company (who will hereinafter be referred to as defendant).

The declaration alleges in substance that the defendant is engaged in bottling Coca-Cola at its plant in Memphis; that on or about March 5, 1930, the defendant wrongfully and negligently sealed up in a bottle of Coca-Cola a decomposed mouse or rat, and permitted said bottle to be sent out to the trade, and in the regular course of its business to be sold and consumed by some one as a healthful, harmless and refreshing beverage; that plaintiff purchased the bottle containing the deleterious substance from the newsstand at Grand Central Station in Memphis, Tennessee; that she sipped or drank a part of the contents of the bottle, and as a result she became greatly nauseated and seriously ill from the effects of drinking the impure and contaminated fluid from the bottle. During the course of the trial of the case, plaintiff was permitted to amend her declaration so as to aver that there was arsenical poisoning in the bottled fluid from which she drank. There was a plea of not guilty by the defendant. At the conclusion of all the evidence the defendant moved the court for a directed verdict in its favor. Motion for directed verdict was overruled, and the jury returned a verdict in favor of plaintiff for One Thousand Dollars. A motion for a new trial by defendant was overruled by the court, and an appeal in the nature of a writ of error was prayed and granted to this court.

Errors have been assigned. Certain of the assignments of error are directed to the action of the court in overruling defendant's motion for a directed verdict on the gounds that there was no material evidence upon which a jury could base a verdict in favor of plaintiff. Other assignments of error are directed to a portion of the general charge of the court to the jury; while other assignments challenge the action of the court in refusing to give in charge certain special requests tendered by defendant.

. Mrs. Rowland testified in substance that she lived at Clarksdale, Miss.; that on March 5, 1930, she came to Memphis to visit her mother, who was ill; that she was anxious to return to her family and went to the Grand Central Station to take a midnight train from Memphis to Clarksdale; that she arrived at the station between eleven and twelve o'clock. She purchased a ticket for Clarksdale and then went up a stairway leading to the general waiting room where was located the newsstand and cold drink stand; she purchased a newspaper at the newsstand, and also a bottle of Coca-Cola at the newsstand. Mr. West, the clerk of the newsstand who sold her a bottle of Coca-Cola, after removing the bottle from the refrigerator, uncapped the bottle and handed it to plaintiff. She then went to the ladies' rest room and took a seat in a chair and began sipping the Coca-Cola from the bottle. She did not examine the bottle or its contents before drinking from it. She did not detect any odor coming from the bottle. While she was sipping the Coca-Cola she was engaged in conversation with two transient ladies who were in the rest room. She suddenly became ill and got up and started to the toilet, but fainted and fell to the floor. When she regained consciousness the two women who had been with her and a strange man were standing over her. She was taken down the steps to the general waiting room near the newsstand. She showed the bottle of Coca-Cola containing the decomposed mouse to Mr. West, the clerk who had sold it to her. When she regained consciousness after fainting she noticed that she had vomited at the place where she fell, and continued to vomit in the waiting room, and was greatly nauseated throughout the night. She did not return to Clarksdale that night. She testified that she did not put the mouse in the bottle.

Mr. West testified in substance that Mrs. Rowland came to the newsstand and purchased a bottle of Coca-Cola, that he took the bottle from the icebox, uncapped it, and handed it to her, and that she asked permission to take it upstairs and drink it; that he granted this permission; that she was gone about ten minutes when she came down to a bench near the newsstand and called his attention to the bottle containing the decomposed mouse and about two-thirds of the fluid remained in the bottle. The Coca-Cola bottle was marked on the bottom of the bottle, or rather stamped in the glass "Clarks-

dale, Miss.'' Dr. Rudisill was called to attend Mrs. Rowland at the station. He saw the bottle with the decomposed mouse in it, and stated the bottle had about one-third of its contents removed. Mr. West testified further that all of the Coca-Cola sold from the newsstand was bought from the defendant, as did also Mr. Harrison, who was in charge of the newsstand in the day. The substance of Mr. Harrison's testimony is to the effect that all of the Coca-Cola sold from the newsstand was purchased from the defendant and delivered by the defendant's employees, and the cases containing the bottles are placed in a storage room opposite the newsstand, and in view of the newsstand. That the storage room is kept locked, except when deliveries are being made and Coca-Cola and other bottled drinks are being taken from the storage room to be placed in the refrigerator, which is behind the counter in the newsstand. He explains with considerable detail the location of the storage room and also the refrigerator, and stated that no person other than the clerks at the newsstand had access to the refrigerator, and that it could not be reached from outside of the counter. He also stated that there are two keys to the storeroom where the cases of Coca-Cola are placed, that he kept one of the keys on a key-ring in his pocket, and the other was hung up inside the newsstand. He also stated that deliveries of Coca-Cola were made by the defendant to him about every three or four days; that no other cold drinks had been delivered to the newsstand and placed in the storage room for about six days before the last delivery of Coca-Cola was made.

This witness also testified that on a previous occasion he had visited the bottling plant in Memphis and had seen its operation; that on one occasion about two years before while he was being shown through the plant and the operation of the machinery and the bottling of Coca-Cola, that he observed an inspector looking off and not watching the bottles as they passed on the moving chain before the lights.

Other witnesses testified as to the condition of the decomposed mouse that was in the bottle soon after Mrs. Rowland became ill after drinking from the bottle. They testified in substance that the mouse was in a bad state of decomposition, greatly swollen, but intact; that some of the hair from the mouse had slipped, but otherwise the mouse was not broken into parts. They also testified that the mouse was too large in its then swollen condition to be put into the bottle through the mouth or neck of the bottle.

One of the witnesses, who testified in behalf of plaintiff, was engaged in the manufacture and sale of rat and mice exterminators, and claimed to have been familiar with the habits of mice and rats, and he testified that a large mouse could enter the neck of a Coca-Cola bottle, even though the neck of the bottle was smaller than the mouse, but that a mouse of the same size could not be pushed or put into the bottle. He explained that a live mouse could squeeze

and contract and elongate the body so as to enter a hole smaller than the body of the mouse.

The defendant introduced evidence explaining the entire operation and process of bottling Coca-Cola at its plant. The washing of the bottles, and the process and machinery used for that purpose was explained in detail; and photographs of the washing machinery, and cleansing machinery and a large blueprint of the bottling machinery were made exhibits to the record. It appears from defendant's evidence that empty bottles are picked up and purchased from the trade and are brought to an unloading platform situated at the north end of the bottling plant. It also appears that in collecting these empty bottles the bottles stamped with the name of other Coca-Cola bottling plants are taken in indiscriminately. These cases containing the empty bottles are taken from the platform to the bottle washing machine, or "soaker," where an employee removes the bottles from the cases and places them on a loading devise on the washing machine. The bottles are placed in racks which are over a box painted white with vitriolite reflecting paint on the inside, which have six 100 watt electric lamps. The operator at this end of the washing machine is required to inspect the bottles for the presence of any foreign substance, dirt, straws, etc. The loading device automatically inverts the bottles and they are thus carried into the washing machine. When the bottles are placed on an endless chain, they first get an exterior washing, and then three rinsings with tepid water forced into the bottles under eight pounds pressure by a centrifugal pump. It then goes into another rinser, referred to as a "prerinser," where it gets two rinsings with water of 100 degrees temperature, which tempers the glass in the bottle before it passes into a chamber containing hot caustic soda solution. In this chamber it gets thirty-six rinsings of fifteen seconds duration each with three and one-half to four percent caustic soda solution heated to 145 degrees Fahrenheit. The caustic solution is forced into small jets with an opening of an eighth of an inch in diameter, at a pressure of fifteen pounds per square inch, which causes a violent whirl of the solution inside the bottle as it rests over the jet. It appears that the chain on which these bottles are carried is not of continuous motion, it moves forward at short intervals from one series of jets to the next, the rinsing from each jet occupying fifteen seconds. After passing through these thirty-six washings of caustic soda solution, the bottle gets three more rinsings with water heated to 100 degrees, and then two rinsings with water at ordinary city water temperature. The bottles are then carried forward by the endless chain and deposited on a table, bottoms down or standing up. At the end of the washing machine process, the bottles are automatically set up in front of another box also painted white inside with vitriolite paint lighted with six 100 watt Mazda lamps, and here the bottles

are again inspected before passing on the endless chain which carries the bottles to the bottling machine.

Mr. Pigeon testified that the highest quality of caustic soda is used in making the solution through which the bottles pass in the cleansing process. He also testified that the machinery used is of the highest type and up to the highest standard of the art for bottling beverages. He also testifies as to the manner of introducing the syrup all of which is by mechanical process. The syrup is emptied first into fifty gallon containers, and passes through a set of strainers that will catch any foreign substance or trash that may be in the syrup, and the syrup is automatically passed from the container by accurate measurements into the bottles as is also the carbonated water. It is shown that there is no chance for any foreign substance to be introduced into the bottles with either the syrup or the carbonated water, and that an instrument which goes into the neck of the bottle and extends down near to the bottom would automatically detect any foreign substance in the bottle, and that such substance would cause the instrument to stop its motion. Other details are set forth showing entire system of washing the bottles, the inspections, both of the empty bottles and the filled bottles, when in the process of washing and in filling the bottles, and to the point of capping the same. There is evidence by defendant's witnesses to the effect that the machinery and floor and premises are kept clean and free from dirt and filth. However, on cross-examination, two of the employees of the defendant, admitted that large and small rats are frequently seen in and about the building.

We think the above statement of the pertinent and material facts is sufficient to present the questions made on this appeal and under the assignments of error.

Cases of this character have been before the courts of this State and other States with greater or less frequency. In the case of Crigger v. Coca-Cola Bottling Co., 132 Tenn., 545, 179 S. W., 155, it is said in the first headnote:

> "The duty of one who prepares and puts on the market in bottles or sealed packages, food, drugs, beverages, medicines, or articles inherently dangerous, of exercising care to see that nothing unwholesome or injurious is contained in the bottle or package is not in the nature of an implied warranty, and is based upon negligence."

There are cases from other jurisdictions and other authorities which hold that an implied warranty exists between the seller and buyer of articles manufactured for human consumption such as drugs, food, beverages, and commodities inherently dangerous. These cases are referred to in Crigger v. Coca-Cola Bottling Co., supra. However, that rule does not obtain in Tennessee, and the Tennessee cases proceed upon negligence as the basis for liability, and not upon

an implied warranty. It is the contention of appellant that there is no evidence of negligence in the present case, and that the rule of res ipsa loquitur has no application under the facts of this case. The rule of res ipsa loquitur finds application "when a thing which has caused an injury is shown to be under the management of the party charged with negligence, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, the accident itself affords reasonable evidence, in the absence of an explanation by the party charged, that it arose from the want of proper care." (DeGlopper v. Railway & Light Co., 123 Tenn., 633, 134 S. W., 609.)

It is further contended by appellant that this rule is a mere rule of evidence; that it merely shifts the burden to the defendant of going forward with evidence, but the burden of evidence remains on the plaintiff; that he must make out his case by the preponderance of the evidence, and the burden of proving by a sufficient quantum of evidence the negative of plaintiff's claim is never cast on the defendant; that it is sufficient if the explanation of the defendant counter-balances the inferences permitted, but not required, by the rule. Citing in support, North Memphis Savings Bank v. Union Bridge, etc., Co., 138 Tenn., 161, 196 S. W., 492; Roth Central Garage v. Holmes, 10 Tenn. App., 500; Nashville Railway & Light Co. v. Owen, 11 Tenn. App., 19; Dayton Bus Line v. Lynch, 6 Tenn. App., 470.

We fully agree that in order to apply the rule of res ipsa loquitur the thing causing the injury must have been under the control and management of the defendant at the time of the casualty. Lewis v. Casenburg, 157 Tenn., 187, 7 S. W. (2d), 808; Casenburg v. Lewis, 163 Tenn., 163, 40 S. W. (2d), 1038. And this limitation on the application of the rule is recognized and supported by the cases cited in the brief of appellant. Wilson v. Colonial Air Transport, 180 N. E., 212 (Mass., 1931); Goldman v. City of Boston, 174 N. E., 686 (Mass., 1931); Scellars v. Universal Service Co., 228 P., 879 (Calif. App., 1924). 258 P., 707, 263 P., 518; Ashton v. Chicago N. & W. R. R. Co., 225 N. W., 328 (Wis.); Springs v. Doll, 148 S. E., 251 (N. C.); Laurent v. United Fuel Co., 133 S. E., 116 (W. Va.); Oil Co. v. Independent Torpedo Co., 107 Okla., 209, 232 P., 419.

It is also too well settled to need citation of authorities that a verdict cannot be permitted to rest upon an inference drawn from an inference or presumption. However, a verdict may be sustained predicated upon legitimate inferences deduced from proven facts. Railroad v. Lindmood, 111 Tenn., 457, 78 S. W., 99.

It is also the contention of appellant that under the facts, and all proper inferences to be deduced therefrom, the jury was left to speculate as to how and when the decomposed mouse got into the bottle of Coca-Cola. This contention is largely based upon the proof

introduced by the defendant, which it is contended conclusively shows that the mouse could not have been in the bottle at the time it was delivered by defendant to the newsstand; that under the evidence of defendant it is shown that it is physically impossible for the mouse to have remained in the empty bottle, had a mouse been in the empty bottle, under the process of washing and cleansing the bottles. There is much to support this contention of appellant. Especially in the matter of cleansing the bottles and the process employed by the defendant, where it appears that after the bottles have been washed in plain water, they are passed through the solution of caustic soda, and that this solution would eat or destroy any animal matter which may be in the bottle, and that subsequent rinsing would remove all particles of it. It would appear that the process of cleansing the bottles is very thorough, and especially the inspectors who are employed by defendant to watch carefully the bottles as they pass before the inspector under strong and efficient inspection lighted boxes, such as the record shows are in use at defendant's plant.

For appellee it is contended that under the well settled rule applicable to motions for a directed verdict the court cannot take the case from the jury or direct a verdict where there is any material evidence to support the verdict, and that the court for the purposes of passing upon a motion for a directed verdict shall consider all of the evidence offered by plaintiff as true, giving absolute verity to the evidence introduced by plaintiff on any question of fact testified to and the strongest inferences to be deduced from such proven facts in favor of the contention of plaintiff. All conflicts in evidence should be resolved in favor of the plaintiff, and viewing the evidence in its most favorable light to the plaintiff of which the evidence is reasonably susceptible, if there are any facts or legitimate inferences that would warrant or support a verdict in favor of plaintiff, the motion for a directed verdict should never be granted. In other words, if there are controverted facts it is for the jury and not for the court to settle. Hence, if there is any material evidence when viewed in its most favorable aspect to the theory or contention of plaintiff, that would support a verdict, the case should always be submitted to the jury. However, this does not mean that if there is a mere spark or glimmer, without material or substantial nature, it would come within this rule. Brenizer v. Railroad Co., 156 Tenn., 479, 3 S. W. (2d), 1053. Nor could a verdict rest upon a mere inference of negligence, where there is no evidence, or proven facts to support the inference.

After all, the question here presented must be determined under the facts disclosed by the record in this case. In the several cases decided by this court and the Supreme Court of a similar nature and under similar circumstances the respective cases were decided

upon the peculiar facts pertaining thereto. It would appear that the holding of the eastern section of this court in Coca-Cola Bottling Works v. Selvidge, 4 Tenn. App., 558, is not in accord with the holding in the case of Roddy Mfg. Co. v. Cox, 7 Tenn. App., 147. However, when those two cases, and the facts of the respective cases are analyzed, they are not out of harmony. Under the Selvidge case it was held that under the facts of that case it was the duty of the court to direct a verdict. In that case the entire process of bottling the Coca-Cola was shown, as in the present case, and there were suspicious circumstances upon the part of plaintiff. In that case it was not shown that there had been no opportunity for the introduction of the broken glass that was found in the bottle after it was delivered by the bottling company to the merchant who sold it to plaintiff. On the contrary, it appeared that there was opportunity for the bottle to have been tampered with and broken glass put into the bottle. Every person connected with the operation of the plant and engaged in any part of the process of bottling the Coca-Cola testified, and from which evidence it was shown that all inspection had been made of the cleansing of the bottles, and under the evidence in that case it was shown that it would have been physically impossible for glass such as was subsequently found in the bottle to have remained in it after it had passed through the cleansing operations and the filling of the bottle. It was shown that every precaution was taken to protect against any foreign substance getting into the bottles, and that the machinery used was up to the highest state of the art, as was also the process. The trial judge refused to grant a motion for directed verdict in favor of defendant, and the eastern section of this court, in an opinion by Justice Portrum, held that it was a proper case under the facts for a directed verdict in favor of the defendant. Petition for certiorari was denied by the Supreme Court, without comment, which operates as a concurrence by the Supreme Court.

The Roddy case was decided by the same section of the court, and during the same year, and certiorari was denied by the Supreme Court. In that case it was held that the trial judge properly overruled the motion for a directed verdict and affirmed the judgment against the defendant. It appeared that the plaintiff purchased the bottle of Coca-Cola from the seller at a restaurant within fifteen minutes after the case of Coca-Cola from which the bottle in question was taken had been delivered by the defendant. It also appeared that there had been no opportunity for the dead mouse to have been placed in the bottle after it came to the restaurant. The restaurant keeper opened the bottle and the presence of the dead mouse was promptly discovered by the plaintiff, and in the presence of the restaurant keeper. It further appeared in that case that two of the employees of defendant who operated the machinery knew more about the operation

of the plant and the bottling than, did the manager, and that these two employees were not called by defendant to testify. Under the facts in that case it was held that the case should be submitted to the jury, although the entire operation of the bottling machinery was shown to be automatic, and the method of cleansing the bottles by passing same through the plain water, and then through the solution of caustic soda, and then being further washed with plain water, very much as in the present case, and the bottles then filled and capped.

In the case of Coca-Cola Bottling Works v. Lewis, 9 Tenn. App., 485, decided by the middle section of this court in December, 1928, and certiorari denied by the Supreme Court, it was held that it was not error for the trial judge to overrule the motion for a directed verdict in favor of defendant where it appeared that the plaintiff purchased the bottle of Coca-Cola from a retail merchant which contained a partly decomposed mouse. In that case, it appeared that plaintiff purchased the Coca-Cola from the retail store. The merchant testified that during the afternoon he ordered a case of Coca-Cola from the defendant and that it was delivered by defendant's employee and salesman; that immediately upon the receipt of the consignment of Coca-Cola, he took some of the bottles from the case and placed them in his ice-box, and he testified that not a single bottle had been taken from the ice-box until plaintiff purchased the bottle containing the dead mouse. In that case the defendant showed the very elaborate process of cleaning the bottles very similar to the process employed by the defendant in the present case, with very similar inspection facilities, including the same solution of caustic soda, and about the same number of applications of the solution to each bottle, and the length of time that the bottles were exposed to the solution, all operated by automatic machinery as in the present case. In the opinion written by the presiding Justice Faw, it was held that there was no error in overruling the motion for a directed verdict made by defendant.

It thus appears from the facts of the Lewis case, as it appeared from the facts in the Roddy case, that the bottle of Coca-Cola was traced directly from the bottling plant to the ultimate purchaser without any intervening agency having opportunity to open the bottle before it was sold to plaintiff except the merchant.

Another case decided by the middle section of this court is the case of Coca-Cola Bottling Works v. Kennedy, 13 Tenn. App., 199, and in which certiorari was denied by the Supreme Court. In that case it was held that the case was properly submitted to the jury, and the motion for directed verdict was properly overruled. The plaintiff in that case purchased four bottles of Coca-Cola from a drug store in Nashville, and took the four bottles to her apartment and placed them in the ice box. On the same evening she with others was play-

ing cards at her home, and she brought the four bottles into the room where they were playing and placed them on the card table. She then removed the caps and served the Coca-Cola in bottles to the three other members of the household, and she began to drink from the fourth bottle when she immediately discovered that there was something wrong with the contents. She became sick and a doctor was summoned who gave her medical attention. The bottle was held up to the light and inspected and it was discovered there was a partially decomposed bug in the bottle. The odor was very offensive, which was noticed by several people, who testified to that fact. While the facts of that case and especially the operation of the bottling plant, set out in the opinion, are somewhat meager, but the opinion does recite as follows:

> "The defendant bottling words introduced testimony showing how the bottles were washed, inspected and filled. It was admitted by the manager that they collect old, dirty bottles and wash and refill them. It was shown that the bottles are put into a machine inverted, and that hot water with a strong solution of caustic soda is turned, under pressure, into each bottle, a number of times, which removes all ordinarily dirt and germs, and even bugs. But it was admitted by the manager that solid substances often get into the bottles that cannot be removed in this manner, and that large bugs would likely not be removed by this system of washing. . . ."

It will thus be seen that the manager of the defendant bottling works plant in the Kennedy case admitted that the process of cleaning and filling the bottles was not such as to prevent bugs and other larger substances from remaining in the bottle after it had been through the washing machine. Under the facts of that case the court held that it was proper to submit the question to the jury as to whether there was negligence upon the part of the bottling works in bottling and putting out the Coca-Cola purchased by the plaintiff.

In the Crigger case, supra, it was said: "That one who prepares and puts on the market, in bottles or sealed packages, foods, drugs, beverages, medicines, or articles inherently dangerous owes a high duty to the public in the care and preparation of such commodities, and that a liability will exist regardless of privity of contract to anyone injured for a failure to properly safeguard and perform that duty."

In the same case it was further held: "That this liability is based on an omission of duty or an act of negligence, and a way should be left open for the innocent to escape. However, exacting the duty or high the degree of care to furnish pure foods, beverages, and medicines, we believe with Judge Cooley, as expressed in Brown v. Marshall, supra (47 Mich., 576), that negligence is a necessary ele-

ment in the right of action, and the better authorities have not gone so far as to dispense with actual negligence as a prerequisite to the liability. In fact, there is no logical basis of liability for personal injury without some negligent act or omission.''

In the Crigger case the jury returned a verdict in favor of defendant, and the Court of Civil Appeals affirmed on the ground that the declaration averred negligence and the jury found against plaintiff on that question, and petition for certiorari in the Supreme Court presented the question as to whether there is implied warranty on the part of the Coca-Cola Bottling Company, which results in favor of the ultimate consumer, regardless of any question of negligence.

In the body of the opinion is contained the following statement on the subject of the method and process of bottling in that case, and also the charge of the court on the subject of negligence:

''The proof shows that the method used at the bottling plant is fully equal to the best. The empty bottle is passed through vats of strong caustic soda solution, and then rinsed under pressure with water as hot as the bottle will stand, then inspected by the use of a strong electric light, then brushed out with a rapidly revolving brush and again rinsed; the bottle is again inspected over a brilliant electric light, and then filled with Coca-Cola, using a fine strainer, when it is capped, and finally inspected.

''The trial judge charged the jury on the theory that if the defendant was free from negligence in the bottling of the beverage there was no liability. . . .''

We think the rule by the decisions from Tennessee reported cases, is that the bottling company is charged with a high degree of care in the preparation and bottling of Coca-Cola intended to be used for human consumption. This rule is announced in all of the cases above referred to on the subject, and is the general rule on the subject in other jurisdictions. There was no error in the charge of the court on this subject as presented by the third assignment of error. This portion of the charge complained of being a correct statement of the law with reference to the degree of care and duty devolving upon the defendant, the special requests tendered were properly refused, and this disposes of the assignments of error from three to nine, inclusive. The portion of the charge complained of under the third assignment of error is as follows:

''In a case where food or beverages are prepared and sold for the purpose of use by the public, the duty of the manufacturer of such food or beverage is to exercise, as our Supreme Court has stated, a high degree of care, to see that their products are wholesome and free from all deleterious substances that are harmful to health, when these products leave the manufacturing

plant and go out in the course of trade to be sold and served to the public. If the defendant has exercised in this case that kind of care as I have explained to you, it has discharged its duty to the public and the plaintiff and should not be held liable. And if it has not, it would be liable, provided you find that the negligence—its negligence, was the proximate cause of the injuries to the plaintiff.''

As above stated, we think this was a clear, accurate, and concise statement of the law with reference to the duty which the defendant owed to the public and to the plaintiff, and fully covered the rule of duty devolving upon the defendant.

However, in the view we have taken of this case, and which we now express, all assignments of error except the first and second need not be considered. We cannot escape the conclusion that there was no evidence, or proven facts upon which a reasonable inference could be predicated, that the defendant was guilty of any negligence in the bottling of this product, and no proof, or facts that would warrant a conclusion that the decomposed mouse was in this bottle at the time the bottle was filled, capped and delivered to the newsstand, where it was sold to plaintiff. Every detail of the process is shown to comply with the highest standard of caution, from the time the bottles are started into the washing machine and come out filled with the Coca-Cola, and capped and delivered to the merchant or dealer. The record in this case discloses, beyond question, that this plant is kept in an unusually clean and sanitary condition. It was regularly inspected by Mrs. Laura Bright, who for a number of years held the position of food inspector in the City Health Department of the City of Memphis. She testified that she inspected the plant of defendant about once a month and that she had been so inspecting this particular plant for eight or ten years. According to her evidence, this plant was given a one hundred percent rating at every inspection made except one, and she then rated it at ninety-five per cent, and explained that on that occasion she found some of the employees did not have or were not wearing clean aprons, and some of the costumes worn by some of the employees were somewhat soiled, which reduced the rating from one hundred percent to ninety-five percent. In answer to one question she states as follows:

"Well, of course, I am not going to knock anybody else, any of the other bottling plants, but I consider the Coca-Cola plant excellent and it is the last word—now, I don't believe a bottling plant could be kept any nicer than the Coca-Cola plant. I give my approval thoroughly—I think this about the Coca-Cola people, they work harder to keep their place cleaner—of course, they have got a lot of money, they can spend a lot of money there—they are painting all the time, scraping and cleaning.

I have never gone to the Coca-Cola place in my life—and they don't know when I am coming there, that they are not doing some kind of cleaning around that place, painting, something extra, besides scrubbing there on the floor all the time.''

We have already set out with some detail the manner of operating and cleaning the bottles, and preparing them to receive the Coca-Cola before they are filled. The numerous washing of the bottles, passing the same through the caustic soda solution, and how that solution operates, and the introduction of the Coca-Cola syrup and the filling of the bottles and the capping of the bottles. In addition to this very thorough process, it is shown by the record that after this suit was instituted Mr. Pigeon, the manager of defendant, conceived the idea of having tests made going to show the physical impossibility of a decomposed mouse having been in the bottle after it had passed through the process of washing and through the caustic soda solution. This test was made when the plant was in the same condition and the same machinery used and the same process of cleaning the bottles and preparing them for filling as at the time the particular bottle in question was bottled. Mr. Pigeon called upon Mr. Friedman, in charge of the Municipal Employment Bureau in Memphis to furnish two disinterested persons to go down to the plant and witness a test that was being made, and in response to this request, made in person by Mr. Powers, also connected with the bottling plant, Mr. Friedman sent a Mr. Burke and Mrs. Floy Roberts, both of whom were then working in the Bureau under Mr. Friedman, and both of whom were strangers to the operators of the bottling plant. When they reached the plant, the plant was in operation bottling Coca-Cola. We here quote from Mr. Burke's evidence:

''I was working in Mr. Friedman's office, Municipal Employment Bureau, at the Auditorium, being one of the unemployed, and Mr. Powers came up and asked Mr. Friedman for two disinterested parties to come down to their plant and witness a test that was to be made that afternoon, Saturday, with reference to a mouse being put into a Coca-Cola bottle and put through the washing machine and for us to watch it all the way through the progress of the bottle through the machine until it had come out at the other end. Mr. Friedman called me, I was at that time staying in the office and asked me if I wanted to do it, and I told him yes, and he asked the gentlemen, if, instead of another man, would he also take a lady who was working there in the office, and he said yes, he would take a lady, a Mrs. Roberts, with me. He told us then to be at the plant at 3 P. M.

''Q. You went there? A. We both went there at 3 P. M.

''Q. Now, tell us who handled the mouse and who put it into

the bottle? A. The engineer, lets see, I forget his name right now, the engineer at the plant and myself handled the house.

"Q. Who put the mouse in the bottle? A. Well, the engineer put it in there with me helping him also; he had the mouse in his hand—both of us put it in there, forced it in with an ice pick.

"Q. Could you force it in there without some instrument of that kind? A. No, sir, you would had to have had a pencil or knife or something of that kind that would go in the neck of the bottle with the mouse to shove it in, for it was real hard to get in. . . . "

The witness then proceeded under questioning to detail the test; that is, after putting the dead mouse into the bottle as above stated, the bottle was started through the washing machine and through the caustic soda solution, until it came out capped. He stated that the particular bottle in which the mouse was placed was marked by having a piece of wire wrapped around the neck. The caustic soda solution would eat or destroy a string or cord, and a wire was used. He stated that no human hand touched the bottle from the time it started through the washing process with the dead mouse in the bottle until it came out filled and capped, and the bottle was then turned over to him and that he had had it in his exclusive possession from that time until the time he testified, and produced the identical bottle at the trial of the case and made it an exhibit to his evidence. He testified that the decomposed mouse was of average size, that he helped to put it into the bottle, and saw the bottle as it started through the washing machine; that the bottle was marked for identification by having a wire around the neck, and that when it came out there was no vestige of the decomposed mouse left in the bottle. Mrs. Roberts testified to the same state of facts, and that after the dead mouse had been placed in the bottle and it was started through the washing machine and finally came out that there was no vestige of the mouse in the bottle.

The engineer of the plant who assisted in these tests testified with reference to the placing of dead mice in bottles and putting them through the machinery, and the process, and that he aided in making the tests with Mr. Burke and Mrs. Roberts. He also testified that in each of the tests made the dead mice were placed in the bottles and the bottles identified by being marked by wire wrapping, and after going through the washing machine and the caustic soda solution and coming out as filled bottles that there was no vestige of the mice in the bottles.

There is other evidence in the record that the caustic soda solution of the strength used in cleansing the bottles at this plant destroys any animal or vegetable matter that may be in the bottles.

Among other theories advanced by the plaintiff is that the mouse

that was in this bottle had probably eaten some poison food, containing arsenic poison. In the course of the trial one of the doctors who testified, and in explaining the symptoms and the character of illness of the plaintiff, intimated or suggested that the illness resembled arsenic poisoning. When this theory was advanced by counsel for plaintiff he was permitted to amend the declaration so as to allege that the bottle contained arsenic, the theory being that the mouse had eaten poison food and that this poison had been released in the fluid. To meet this theory the defendant introduced Dr. Mantel, who is the chemist and bacteriologist connected with the City of Memphis. He testified that he was a chemist and familiar with the effects of arsenic poisoning. He testified that a mouse that had died from arsenic poisoning could not impregnate the fluid in a bottle of Coca-Cola with the arsenic. When asked on that question, his answer was "Absolutely not," and when asked why, he answered: "Because the arsenic that may have killed the mouse would have become fixed with the tissues, causing it to form an organic chemical compound.

"Q. What would that organic chemical compound be? A. Arsenic albuminate.

"Q. You do not think any of it could escape in that fluid? A. No, sir."

On the other hand, there were opportunities for improper tampering with the bottle of Coca-Cola in question after it was delivered to the newsstand by the defendant. The deliveries are not made daily. Sometimes several days elapse between deliveries of Coca-Cola to the newsstand. When it is delivered it is placed in a store room on the other side of the room from the newsstand. This newsstand sells other cold drinks bottled by other concerns, which are likewise placed in the same store room where the Coca-Cola cases are placed, and the Coca-Cola and other cold drinks are taken from the store room and put into the ice box in the newsstand as needed. It is also shown that the caps may be removed and replaced by hand.

Without discussing the facts as disclosed by the record further, we are of the opinion that the plaintiff has failed to show that the defendant was guilty of any negligence in the matter of bottling Coca-Cola. To the contrary, we think that under the facts of this record it would have been physically impossible for a dead mouse to have been bottled up in the Coca-Cola at the plant. Nor do we think that another theory of the plaintiff finds any support under the facts of the record. We refer to the theory advanced by plaintiff, that even though the washing and cleansing process would, remove any foreign substance from the bottle, that the mouse could have gotten into the bottle after it was washed but before it was filled with Coca-Cola. This could only be accomplished by the mouse climbing up the steel leg to the table, and then climbing up the glass bottle, and entering the bottle in that

way. It is shown that mice do not have suction pads on their feet, and hence cannot climb a slick glass surface, and this disposes of that theory.

We are constrained to reach the conclusion that there was no proof of negligence, and that any presumption that may have been created by the mere finding of a dead mouse in the bottle of Coca-Cola by plaintiff is fully met by the evidence in the nature of physical facts introduced by the defendant, and hence the physical facts as shown by the manner in which the Coca-Cola was processed makes it not only highly improbable but practically impossible for the mouse to have been in the bottle at the time it was filled with Coca-Cola and delivered to the newsstand for sale. It results that the first and second assignments of error are sustained, and the suit dismissed at the cost of plaintiff.

Heiskell and Owen, JJ., concur.