# COLE v. STANDARD OIL CO. OF NEW JERSEY.
## —197 S. W. (2d) 13.

Western Section. June 11, 1946.

Petition for Certiorari denied by Supreme Court, October 5, 1946.

Charles L. Neely and Henry M. Crymes, both of Memphis, for plaintiff in error.

Armstrong, McCadden, Allen, Braden & Goodman and John W. Harris, all of Memphis, for defendant in error.

BAPTIST, J. The parties will be referred to as in the Circuit Court.

The plaintiff, Julia J. Cole, sued the defendant, Standard Oil Company of New Jersey, for damages for alleged personal injuries alleged to have been suffered by reason of the negligence of the defendant's agent and servant, one Duncan while acting in the course and scope of his employment, and in furtherance of the business of the defendant.

The case was submitted to a jury upon the issues and a verdict rendered in favor of the defendant.

The plaintiff's motion for a new trial was overruled and judgment entered on the verdict. From this action the plaintiff has appealed and assigned errors.

The declaration alleged in substance that at the time of the injury she was employed by the United States government and her duties as such employee required her to stay at the bulk storage plant of the defendant in Shelby County, Tennessee, and while there, among other duties, to ascertain the temperature of gasoline inducted into tank wagon, trucks and trailers from the storage tanks; that on the occasion of the injury she was standing along a large tank trailer into which gasoline was being pumped from an underground tank; that the top of the trailer was rounded and from 10 to 12 feet above the ground; that one Emerson Duncan, driver of the trailer and servant of the defendant in the scope of his employment, was on top of the trailer engaged in transferring gasoline from the underground tank into the compartments of the trailer; that in doing so the said Duncan improperly allowed a quantity of gasoline to spill on top of the trailer

from the nozzle of the pipe conveying same, and that a joint of this pipe was faulty by reason of which a quantity of gasoline was spilled on top of the trailer; that it was customary for the driver of a tank trailer to insert in each compartment as it was filled, a thermometer suspended on a wire, to inspect the thermometer and then hand it to the government inspector; that the said Duncan pulled the thermometer from one of the compartments and took a step forward to lean over and hand it to the plaintiff; that his foot slipped because the top of the trailer was wet with gasoline, which had been spilled by reason of which the said Duncan fell, striking the plaintiff and injuring her.

The defendant filed the plea of not guilty. On motion of the plaintiff the defendant was required to plead specially and these pleas denied all the material allegations in the declaration and setting up the defense that the driver in assisting the plaintiff about her duties was not acting within the scope of his employment; that it was not guilty of negligence as alleged and that the plaintiff was guilty of proximate or contributory negligence.

At the conclusion of all the evidence the plaintiff was allowed to amend her declaration as follows: "The defendant, by its said agent or servant, was negligent in allowing gasoline to spill on top of the tank trailer from the cup at the bottom of the thermometer, or in any other manner."

The plaintiff, Mrs. Cole, was employed by the government as petroleum inspector, and, at the time of her injury, was stationed at the bulk plant of the defendant, Standard Oil Company. The defendant was engaged in supplying the Air Force with high octane gasoline and for the purpose of delivery a large truck or transport was used. The transport had five compartments, which were

filled consecutively from an underground tank. This was done by a pipe leading from the underground tank to the manhole in each compartment at the top of the truck.

That part of the truck for holding gasoline was rounded and on top of the truck was a corrugated iron walkway extending its length so that the person engaged in loading could walk from one manhole to the other.

When empty, each compartment was sealed and these seals were required to be inspected by the government inspector when the transport was ready to be loaded.

The duties of the plaintiff as inspector were to check the transport as to its suitability, to check each compartment as to its cleanliness, and to check the transport for static and for markers in the compartments of the trailers. It was also the duty of the inspector to check the temperature of the gasoline. This was done with a thermometer, the bulb of which rested in a cup. When it was taken from the tank the bulb remained in the cup of gasoline until it was ready to be read so that there was to be no change in the temperature from exposure to air.

As to the immediate facts, the plaintiff testified: "On October 26, 1944, I was on the night shift, and I had two stations to work at this particular time, the station that this particular accident happened and another, and I checked this transport before I left this station to go to the next station to check it so as to get back in time to check this transport leaving this other station. So when I left this station where the accident happened I checked accordingly to suitability, and the truck at that time was pulled to the platform. It was very conveniently arranged for me to step across. I checked each compartment to see that there was not anything that could contaminate this gasoline or any substance in there that might prove fatal; also we checked the static line at that

particular time. After leaving this station I went to the other station to do the same work and I came back to this particular station. It took a transport a half hour to fill completely, and I came back in time to check the degree gallons and to get the temperature, and when I came back to get the temperature on this particular transport they had moved the transport and pulled it further away. So as I approached the truck Mr. Duncan asked me if I wanted to certify the reading of this thermometer. They were reading it and I was supposed to certify the reading, and I did that, and in this particular operation in handing me the thermometer he stepped on the gasoline that he had carelessly spilled in filling the compartments and of course slipped and fell and knocked me to the ground. That is the way I was injured, but I am making this explanation as to how the gasoline was wasted. There is five compartments and they have a nozzle on the filler and they fill each compartment to the level of the markers. When they do that they are supposed to cut the gas off so that it will not spill on the transport carelessly. Most of the drivers generally take time to do this but on this particular time he did not, and he wasted quite a bit of gasoline from filling one compartment to the other, dragging it to the other compartment, and not turning the valve off. That is how it was spilled that particular night and of course gasoline makes the transport pretty slippery, and in this particular instance he was in the act of handing me the thermometer when he slipped and fell.''

The driver of the defendant's truck, Emerson Duncan, testified that the plaintiff was not present when he drove the truck to the loading platform; that the man on duty checked the seals and he proceeded to load the truck; that when it was about one-half loaded the plaintiff came

from the defendant's office; that at that time the thermometer was in compartmnet No. 3; that when the plaintiff appeared he took the thermometer from the compartment and read it; that he then handed it to the plaintiff over the side of the truck who read it and handed it back to him; that a small amount of gasoline spilled on the truck from the cup; that when he stepped back on the truck he slipped on the gasoline and fell on the plaintiff; that the only gasoline spilled on the truck was that from the cup.

The witness Raymond Minish, testified that he was in charge of the bulk plant from 3:30 to 11:30 p. m. at the time the plaintiff was injured; that at the time the truck in question arrived he and the plaintiff were in the Company office; that when he saw the truck arrive he told the plaintiff about it and she asked the witness if it was clean; that the witness went out and looked at the seals and finding them all right, the loading of the truck proceeded; that he went back into the office where the witness was to make out the billing for the truck's load; that the plaintiff came out of the office about the time the truck was two-thirds loaded and stood by the side of the trailer; that the driver had placed the thermometer in the third compartment; when the plaintiff asked the temperature the driver took the thermometer from the compartment, read it and handed it down to the plaintiff and:

"Q. Just what happened then? A. Mrs. Cole asked the temperature and of course I had to know it too, and he took the thermometer from out of the truck and looked at it and read the temperature and told us what it was. Then he asked Mrs. Cole if she wanted to see it. She says, 'I am supposed to,' so he handed it down to her.

"Q. Now, in handing it down to her, did you notice

anything happen? A. Well, no more than just hand it to her, that is all.

"Q. Did she look at it? A. Yes sir.

"Q. And just describe to the jury what occurred then. A. Well, after she took the thermometer why she started to hand it back up to Mr. Duncan, and it has a wire on it, so in handing it down one can reach from the top of the trailer down to the ground you see with it, but in handing it back up you have to kind of get it like that (illustrating with thermometer). Well, Mr. Duncan had to reach over pretty far to get it, and in taking it out and handing it to Mrs. Cole of course there was some gasoline dripped from there and made a spot the size of my hat and when he reached back to get it he placed his foot in the wet spot and his feet went out from under him and he fell from off the top of the trailer.

"Q. Did you see where Mrs. Cole was when he started to fall? A. Yes, sir.

"Q. What did she do? A. She took about a step or step and half forward and threw her arms up, looked like she was trying to catch him.

"Q. Did she step up? A. Yes, sir, and walked up closer to the trailer to try to catch him, the way it looked.

"Q. Did she make the statement afterwards in your hearing? A. You mean about what she done?

"Q. About what happened? A. She told us she tried to catch him."

The evidence and the photograph shows that at the point where the transport was to be loaded there was a platform with steps leading up to it and a moveable or folding walkway from this platform to the top of the truck. By using this arrangement the inspector could reach the top of the transport in safety and perform there the duties required of her.

The only material difference in the testimony as to the immediate happening is the statement of the plaintiff that the driver slipped and fell as he was handing the thermometer to her, and the testimony of Duncan and Minish that the driver handed the thermometer down to her that he slipped and fell as she was handing it back to the driver.

Briefly stated the contentions of the parties are as follows: the plaintiff contends that the driver of the transport was negligent in permitting gasoline to be spilled from the nozzle of the pipe in transferring from one compartment to another and by reason of a leaky pipe or valve; that the driver knew or ought to have known that such action would cause the top of the transport to become unsafe, that the driver, acting within the scope of his employment, removed the thermometer and handed it down to her and slipped because gasoline had been spilled on top of the transport. The contention of the defendant is that no gasoline had been spilled on top of the trailer by reason of removing the nozzle from one compartment to the other; that there was no loose pipe or valve so as to permit gasoline to be spilled on top of the transport; that the defendant maintained a platform and folding walkway for the use of the plaintiff in performance of her duties; that it was the duty of the plaintiff to mount the top of the transport to inspect the compartments and seals and to obtain the temperature of the gasoline; that in undertaking to perform the duties of the plaintiff the defendant's servant was acting beyond the scope of his employment; that the plaintiff was guilty of contributory negligence in not mounting to the top of the transport and in standing on the ground below the driver; and in requesting the driver to hand her the thermometer when she knew that it would be necessary for him to stoop

down over the rounded body of the transport in order to reach the plaintiff with the thermometer.

The assignments of error are based on portions of the general charge; or in giving certain special instruction for the defendant and in denying a certain special request for charge in behalf of the plaintiff.

Assignment No. III is made on the following portion of the court's charge: "The Court erred in charging the jury as follows:

". . . . but a master or employer is not liable for the acts of his servant or employee beyond the scope of their employment. The phrase in the course or scope of their employment when used relative to the acts of a servant means while engaged in the service of his master or employer, or while about his master's or employer's business. For an act to fall within the scope of employment it must be done in furtherance of the master's business and incident to the performance of duties entrusted to the servant by the master. It must be done in prosecution of the master's business, or in executing his orders, or doing his work. It must be connected with some mission or performance for the master or employer where the act is necessary to accomplish the purpose of the employer and intended for that purpose. If the servant or employee steps aside from his employment, that is, abandon it for the time being, to commit an act not within the course or scope of his employment, the master is not liable therefor. The test to determine whether the master is liable to strangers for the consequences of his servant's misconduct is to inquire whether the servant or employee was doing what he was employed to do at the time he caused the injury complained of. If he was, the fact that he was not doing it in the way expected is immaterial."

Assignment No. IV is as follows:

"The Court erred in instructing the jury as follows:

"On the other hand, if you find that the plaintiff suffered no injury, or that if she suffered an injury the injury that she suffered was proximately caused by the negligent act of the defendant's employee while acting without the scope of his employment . . ."

Assignment No. V is as follows:

"The Court erred in granting special request No. 1 of the defendant as follows:

"The Court charges you that the master is not responsible for the acts of his servants committed outside his line of duty and the scope of his employment. If you find that Raymond Duncan, employee of the Standard Oil Company, departed from his duties to his employer, the Standard Oil Company, in the assisting of the plaintiff, Mrs. Cole, in the performance of her duties for her employer, and that as a result of the departure of Raymond Duncan from his duties to the Standard Oil Company the accident occurred, then and in that event your verdict should be for the defendant."

■ The plaintiff's assignment of error that there is no material evidence to support the verdict is based upon the contention that there is no evidence that the driver was acting without the scope of his employment. The argument is that the evidence shows that the driver's act in assisting the plaintiff in the performance of her duties was in furtherance of the defendant's business and therefore within the scope of his employment. We are unable to agree with this contention. There is evidence that the defendant provided a place of safety for the plaintiff in the performance of her duties and that she voluntarily placed herself in a place of danger; and, in such position, requested the driver to assist her in the performance of

460

her duties. There is no evidence that it was a part of the driver's duty to so assist her, and under these circumstances it was proper for the Court to charge the rule of respondeat superior.

"The question as to whether the servant's or employee's act may reasonably be held within the scope of his employment is ordinarily one of fact for the determination of the jury." Home Stores, Inc., v. Parker, 179 Tenn. 372 at page 379, 166 S. W. (2d) 619, 622.

The plaintiff's contention as to her assignment on the general charge of the Court on respondeat superior designated as No. III is that the Court should have included in the instruction that in order for the jury to find that a deviation had occurred they must find that the stepping aside from his business was for purely personal reasons of the driver and wholly disconnected from such duties.

We do not think it would have been proper for the Court to have included such language in his charge under the facts of the case. There was evidence that the driver deviated from his duties to assist the plaintiff in the performance of her duties and the rule is that if the servant deviates from his duties on the mission of a third party, the master is not responsible. Woody v. Ball, 5 Tenn. App. 300.

As to the assignment of error designated as No. V the plaintiff contends that the special request of the defendant granted by the Court containing the hypothetical statement there made, gave undue emphasis to the defendant's contentions in view of the Court's general charge on the question of respondeat superior.

The instruction complained of correctly states the law of the case as applied to the particular facts on which the defendant relied, and we are of the opinion that it was proper for the Court to give it. We are unable to

agree that such instruction laid undue emphasis on the defendant's theory of the case.

The plaintiff assigns error on the action of the Court in granting the special request of the defendant as follows: "The Court charges you that if you find that it was apparent to the plaintiff that there was gasoline on the rounded portion of the transport of the defendant, which gasoline had been recently spilled, and it was necessary for Raymond Duncan, driver of the defendant's transport, to step from the catwalk to the rounded portion of the transport, which was wet with gasoline, and stepping from the catwalk onto the rounded portion there was danger that the driver might slip on the gasoline which covered the rounded portion of the truck, and that she continued to stand there directly beneath him on the ground while he was stepping onto the rounded portion of the truck, then and in that event, the Court instructs you that the plaintiff was guilty of negligence and it is for the jury to determine whether or not such negligence was a proximate cause of the accident and resultant injury to the plaintiff, if you so find, the plaintiff may not recover."

The plaintiff had alleged in her declaration and testified that a quantity of gasoline had been spilled from the nozzle onto the truck by the driver and a quantity of gasoline had been spilled on the truck from a leaky joint in the pipe. The instruction complained of dealt with this aspect of the case.

It states a hypothetical case, which if found to be true by the jury, constituted negligence on the part of the plaintiff. There was evidence tending to show these facts. The general charge had not stated the legal effect of these facts, if found by the jury, and we think the defendant was entitled to a statement of the legal effect under these facts.

The plaintiff assigns error on the failure of the Court to give in charge the following special request for the plaintiff: "If you find from the evidence that, at the time that Raymond Duncan, the driver of the defendant's truck, undertook to hand the thermometer to the plaintiff, Raymond Minish was present, knew of such acts by the truck driver and acquiesced therein, and if you further find that said Minish was placed in charge of said bulk plant on Wisconsin Avenue by the defendant and authorized to supervise the conduct of truck drivers; such acquiescence in the said conduct of said Duncan on the part of the said Minish would constitute authority, binding on the defendant, authorizing said Duncan to do these acts, and would amount to a ratification of those acts."

This request assumes that Minish was authorized to supervise the conduct of truck drivers in their duties. The record does not warrant this assumption. The evidence is that Minish was in charge of the plant during certain hours, that his duty was to see that the gasoline was properly measured by a meter and make out a billing for the load. The duties of the driver in loading the truck were independent of those of Minish.

We think there is material evidence to support the jury verdict. There is evidence that the plaintiff was required to perform certain duties and that she was provided a place of safety in which to perform these duties. There is no evidence that it was a part of the driver's duty to assist her in performing these duties and no evidence that the defendant knew of or ratified his act in so doing.

We find no error and therefore all of the assignments are overruled and the judgment of the Circuit Court is affirmed. The plaintiff will pay the costs.

Anderson and Ketchum, JJ., concur.