**Betty BOWERS, Executrix of The Estate of Fred Wilson Weatherly, Deceased, Plaintiff-Appellant,**

v.

**Erving L. POTTS, and J. W. Petty Construction Company, Inc., Defendants-Appellees.**

Court of Appeals of Tennessee, Middle Section.

March 13, 1981.

Certiorari Denied by Supreme Court June 1, 1981.

Thomas L. Reed, Jr., Murfreesboro, for plaintiff-appellant.

Michael Murphy, Murfreesboro, for defendants-appellees.

## OPINION

CONNER, Judge.

(Filed with concurrence of participating judges)

In this wrongful death case, the jury found against both defendants. As to one defendant, the master, the trial judge set aside the verdict and dismissed. As to the other defendant, the servant, the trial judge approved the verdict and entered judgment for the plaintiff. The servant has not appealed, but plaintiff has appealed from the dismissal of the master.

On Saturday, August 19, 1978, at approximately 1:00 p. m., Fred Wilson Weatherly and Erving L. Potts were involved in a vehicular accident at the intersection of Almaville Road and Poplar Wood Road in Rutherford County. Weatherly died at the scene. His executrix brought the instant action against Potts. Subsequently, that suit was amended to include J. W. Petty Construction Company (hereafter "Petty") as a party defendant. In the amended complaint, plaintiff alleged that Potts was an employee of Petty and was at the time of the accident in the course and scope of his employment with authorization from his employer. Through every stage of the proceeding Petty vigorously contested the proposition that Potts was engaged in the business of the employer or that Potts had authority to represent him. At the conclusion of discovery, Petty filed a motion for summary judgment; at trial, both after plaintiff's proof and defendants' proof, Petty moved for a directed verdict. All of these motions were denied by the trial court, and the question of the applicability of the doctrine of *respondeat superior* was submitted to the jury. However, after return of a verdict for $75,000.00 against both the defendant Potts and the defendant Petty, the trial court granted the motion of defendant Petty to set aside the verdict as to it, denying a like motion by Potts. Plaintiff appeals that ruling.

There has been no appeal by Potts and no complaint to this court concerning the determination of fault as to Potts or the amount of the verdict. Accordingly, we will only review the proof adduced on the master-servant question as between Petty and Potts to determine if there was any material and credible evidence to support the verdict of the jury that Potts was indeed the agent of Petty at the time of the accident. See *Vaughn v. Shelton*, 514 S.W.2d 870 (Tenn.App.M.S.1974). If so, we must reverse. If not, we must sustain the trial court.

■ Unlike the situation where the court may act as the thirteenth juror and order a new trial, a verdict must be directed during trial or post-trial only where there is no reasonable basis for sustaining the verdict.

■ On review of the grant of a directed verdict on motion of a defendant, it is not the office of an appellate court to weigh the evidence. Rather, it must take the strongest legitimate view of the evidence in favor of the plaintiff, indulging in all reasonable inferences in his favor, and disregarding any evidence to the contrary. The trial judge's action may be sustained only where the evidence is uncontradicted and a reasonable mind could draw only one conclusion. *Keller v. East Tennessee Production Credit Association*, 501 S.W.2d 810 (Tenn.App.E.S. 1973).

Is the competent evidence negating agency so uncontradicted as to justify the extraordinary action of the trial court in ignoring the verdict of the jury? We think so.

Uncontroverted facts are that Petty, a Kentucky corporation with its principal office in Bowling Green, contracted with South Central Bell (hereafter "Bell") to lay underground conduit from the Bell office in Smyrna to the west edge of town. As a part of the construction project, it was necessary to extract dirt and other underground soil material in various amounts and of various types from the route of the underground conduit. It was known prior to the start of construction that there would be some topsoil or "good" dirt excavated and some soil material composed in large part of rock, pavement fragments, debris or other generally "bad" soil material incapable of supporting vegetation known as "overburden." Further, it was known that there would be some excess soil materials which, at least initially, would not be replaced in the trenches. But, after settling, more dirt would be required. Accordingly, prior to beginning the work in May of 1978, Petty made arrangements with Bell to store, on a lot owned by it in Smyrna, excess "good soil" excavated during the project. There was the further understanding that since the Bell lot had some

low areas if, at the conclusion of the work, there was excess good soil, it would simply be left on the Bell lot. Similar arrangements were made before any construction with a local business. Smyrna Hardware and Lumber Company, to deposit excess "overburden" or "bad soil" on its lot which was also low and in need of fill. Both of these locations were within the city limits of Smyrna and within a mile of each other.

Defendant Potts was the owner of a dump truck. After work on the project was commenced by Petty in June of 1978, Potts was initially hired by Petty for the purpose of hauling dirt from the project as needed and paid on an hourly basis.

The project did not proceed to the satisfaction of Petty, and on July 10, 1978, Potts was hired as the job foreman of Petty. After assuming this capacity, Potts became a salaried employee and also leased his dump truck to Petty at the rate of $15.00 per hour. Potts was still serving in the capacity of foreman on the date of the accident, though he was terminated on September 22, 1978, approximately one week before the project was completed. As the job foreman Potts had day to day responsibility for the progress of the work, though "two to three days a week," either Billy Petty or E. A. Sanson, representatives from the home office of Petty, would visit the job site. They kept close contact with the progress of the job and were the direct superiors and supervisors of Potts. One of the things that Billy Petty did was to advise Potts of the respective arrangements in regard to storage of surplus "good soil" and "overburden" storage and disposal on the lots of South Central Bell and Smyrna Hardware and Lumber Company, respectively.

August 19, 1978, the date of the accident, was a Saturday. There were no workmen on the job on that Saturday, or on any other Saturday. At the time of the accident defendant Potts was hauling a load of dirt in his dump truck from the Bell lot to the property of one Earl Terrell. He was paid by Mr. Terrell—not Petty—for hauling dirt on this occasion and at prior and subse-

quent times. Further, he asked for and received nothing from the defendant Petty for either his labor or the use of his truck on that or any other Saturday. All of these facts are uncontroverted.

The theory of liability on the part of Petty follows: Only "good soil" (as opposed to "overburden" or "bad soil") was to be left on the Bell lot. Some "overburden" got on the Bell lot (though exactly how, it is not clear), and Potts concluded that it had to be moved in the performance of the work that Petty had contracted to do. Rather than move it ¾ of a mile to the Smyrna Lumber and Hardware Company lot during the week at company expense, Potts made the judgment in his capacity as foreman to move it 4½ miles to the property of Earl Terrell on Saturday; thus, the plaintiff asserts that Petty was liable even though it was not on a workday, even though Potts was being compensated by Terrell and not by Petty, and even though Petty was deriving direct personal benefit from his labors. Potts testified that by hauling off the "overburden" on Saturday it was saving Petty the expense of renting a truck, paying a truck driver and paying the operator of a loader. Further, and most significantly, on the question of authority from his employer, defendant Potts testified that he had discussed with Billy Petty and received authorization from him to remove the "overburden" from the Bell lot and to dispose of it.

To the contrary, portions of the deposition of Billy Petty taken prior to the trial were introduced, and W. A. Sanson testified at trial. These witnesses categorically denied any knowledge of the extra labors of Potts on this Saturday or any other. They denied that there had ever been any conversation about removing any dirt from the Bell lot for any purpose other than to refill and replenish the ditches where the cable had been laid after settling. They affirmatively stated that any extra soil, whether good or bad, could and should have been left on the Bell lot to fill low spots unless moved to Smyrna Hardware and Lumber Company. Further, they said that at the time Potts was hauling the dirt to Terrell's, it was impossible to know whether all or some of it would be needed to put back into the project. To prove this last point, defendant Petty proved that there was, in fact, insufficient fill dirt on the Bell lot to complete restoration of the line and that some dirt had to be obtained from other sources for that purpose near the completion of the project.

If that were the sole state of the proof, we would clearly be left with a jury decision on the question of agency and on the motivating intent of Potts. Stated another way, the question would be what was the actuating motive of Potts? *See* W. Seavey, Law of Agency § 150 (1964); Restatement (Second) of Agency § 228 (1958).[1] The jury could have concluded that even though Potts was also advancing his own interests, he was intending to further the business of his employer at the same time. *See* 53 Am.Jur.2d *Master and Servant* § 432 (1970). Or again, stated in another way, *but for* serving the legitimate business of the master, Potts would never have been working on Saturday and deriving an incidental benefit for himself. Further, the jury could have believed Potts' testimony that he had express authorization from Petty to haul the dirt for company purposes. *See Heywood Feed Ingredients, Inc. v. State*, 49 Tenn.App. 544, 356 S.W.2d 605 (W.S.1961) and the cases cited therein. Alternatively, the jury might have even inferred authorization by the nature of Potts' position

1. *General Statement.*
   (1) Conduct of a servant is within the scope of employment if, but only if:
   (a) it is of the kind he is employed to perform;
   (b) it occurs substantially within the authorized time and space limits;
   (c) it is actuated, at least in part, by a purpose to serve the master, and
   (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
   (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

with the company and the type of activity with which he was engaged. Further, if Potts' testimony were believed, it would appear to be within the range of behavior contemplated by the principal. *See Rich Printing Co. v. McKellar's Estate*, 46 Tenn. App. 444, 330 S.W.2d 361 (W.S.1959); *see also Sullivan v. Morrow*, 504 S.W.2d 767 (Tenn.App.M.S.1973).

But alas for the plaintiff, this is not all there is to the matter. Without the testimony of defendant Potts on these critical points, there is no credible or material evidence in the record to sustain the verdict. And we find, as obviously did the distinguished trial judge, that the testimony of Potts was so fatally impeached as to make his testimony insufficient as a matter of law to sustain a jury verdict.

■ First, and of great significance, in response to plaintiff's amended complaint which alleged that Potts was acting in the course and scope of his employment, Potts specifically *denied* that he was acting as Petty's employee at the time and place of the accident. Granted, the answer was not sworn to; however, the law in this state is that "a pleading filed in a cause by a party, though not under oath, is conclusive evidence against him." *Osborne v. Hartford Accident & Indemnity Co.*, 63 Tenn.App. 518, 533, 476 S.W.2d 256, 262 (M.S.1971); *Hewgley v. General Motors Acceptance Corp.*, 39 Tenn.App. 553, 286 S.W.2d 355 (M.S.1955).

Also, Potts' answer to interrogatories propounded by the plaintiff in connection with his employment at the time of the accident prior to plaintiff's adding Petty as a party defendant had a devastating effect to Potts' credibility. There Potts stated under oath:

> On the date of the accident, 8–19–78, the defendant *was working for himself* hauling dirt to fill in a yard for a man who was building a house, and was being paid either $10.00 or $15.00 per load.... During this time, the defendant worked for J. W. Petty Company *during the week* .... (Emphasis supplied).

When propounded the specific question by interrogatory to: "State the purpose of the trip you were on at the time of the incident referred to in the complaint," Potts answered: "Hauling dirt. See response to No. 4." The answer to question 4 in pertinent part is quoted above that Potts "was working for himself...."

Granted, at trial, Potts tried to take the diametrically opposed position that he was on his master's business. Nonetheless, even then on cross examination, Potts ultimately admitted: "on that Saturday *I was working for myself.*"

In *Taylor v. Nashville Banner Publishing Co.*, 573 S.W.2d 476 (Tenn.App.M.S.1978), the plaintiff claimed that he had been libeled by the defendant. The trial court granted a motion for summary judgment in favor of the defendant. On appeal, the plaintiff urged that a statement of fact by one witness in deposition could be used to establish a material issue of fact with respect to the legal issue of malice. The court of appeals pointed out that the same witness had, in a second deposition, contradicted the same fact that he had asserted in his first deposition. Relying upon the proposition that "contradictory statements of a witness in connection with the same fact have the result of cancelling each other out," the court affirmed the trial court's grant of a summary judgment to the defendant. *See also DeGrafenreid v. Nashville Railway & Light Co.*, 162 Tenn. 558, 39 S.W.2d 274 (1931); *Johnston v. Cincinnati N. O. & T. P. Railway Co.*, 146 Tenn. 135, 240 S.W. 429 (1922); *Donaho v. Large*, 25 Tenn.App. 433, 158 S.W.2d 447 (E.S.1941); *Southern Motors, Inc. v. Morton*, 25 Tenn. App. 204, 154 S.W.2d 801 (W.S.1941); *Nashville & American Trust Co. v. Aetna Casualty & Surety Co.*, 21 Tenn.App. 366, 110 S.W.2d 1041 (M.S.1937).

If this were not enough to totally impeach the testimony of Potts, there is more that must be considered. In his deposition, he said that there was not a lot of "overburden" and "good soil" to be removed, because most of it was immediately put back in the trenches. But, he also said

that the dirt that was being stored was more than was needed. This is contrary to the testimony of Mr. James Hickman of Bell. Later, and in complete contradiction to this testimony, Potts acknowledged that there was no surplus "good soil" nor "overburden" left on Bell's lot when he was discharged by defendant Petty about one week prior to completion of all work on the project and that backfilling operations required "quite a bit" of dirt. Also, in his deposition, Mr. Potts said that his extracurricular hauling activities were performed "strictly" on Saturdays. He said that he had hauled dirt for others on Saturdays prior to the accident. Specifically on August 12, just one week prior to the accident, he had hauled seven loads of dirt from Bell's lot. The defendant had paid him nothing for moving dirt on Saturdays, because he was "doing it on his own." Further, he testified that he was hauling dirt "for Earl Terrell" on the date of the accident; and also that when Mr. Terrell had first approached him about obtaining dirt, he had told Mr. Terrell he was stockpiling good soil on Bell's lot and dumping "overburden" on Smyrna Lumber & Hardware's lot during normal working hours. Potts told Terrell that he would have to provide dirt for him only when he could find "spare time."

At trial, Mr. Potts acknowledged that he had been hired as foreman on July 10, 1978 (about one month after defendant had commenced work on the project in question) and discharged on September 22, 1978 (about one week prior to completion of the project). He acknowledged that he knew "overburden" was to be dumped on Smyrna Lumber & Hardware's lot, and surplus "good soil" was to be stored temporarily on Bell's lot. When deposed, he claimed that Billy Petty knew about and approved of his extracurricular hauling activities; but at trial he declined to reaffirm such claim. Further, in court Potts testified that when he was first approached about hauling dirt for Mr. Terrell, he said that he could not haul dirt for him during regular hours (which he admitted were from Monday through Friday) and would have to do it

"on my own time." After being discharged by defendant, he acknowledged that he continued to be paid by Mr. Terrell. He acknowledged that Mr. Terrell paid him for his activities on the day of the accident and that he received nothing from defendant for his labor or for the use of his truck on that day. He admitted that, even as defendant's foreman, he was subject to, and bound by, instructions and control of both Billy Petty and Sanson.

■■■ For the reasons set forth herein, the testimony of the defendant Potts on the critical issue of agency must be totally discounted. As previously stated, it is the well-established rule in this state that contradictory statements by a witness with respect to the same issue of fact cancel or negate each other. See *Taylor, supra.*

Is there then sufficient basis to sustain the jury's verdict without resort to his testimony. We think not.

■■■ The distinguished counsel for the plaintiff argues vigorously that because Billy Petty did not testify at trial and since he has peculiar knowledge of the facts and would naturally favor the contention of defendant Petty, an inference is thereby raised that his testimony would be unfavorable to that contention. See D. Paine, Tennessee Law of Evidence, § 46 (1974); *National Life & Accident Ins. Co. v. Eddings,* 188 Tenn. 512, 221 S.W.2d 695 (1949); *Fisher v. Travelers' Insurance Co.,* 124 Tenn. 450, 138 S.W. 316 (1911). However, that is not the case here. Billy Petty *did* testify through the introduction of numerous portions of his discovery deposition by counsel for plaintiff and the defendants. Obviously, counsel for defendant Petty was satisfied with the quality and quantity of the proof from Billy Petty so as not to expose him to the risks inherent in more cross examination. This trial tactic required counsel for plaintiff to either call Petty as his witness or be content with reading into the record from his discovery deposition, which was exactly what happened. So long as the "available" and material witness testifies, though it be through use of his depo-

sition rather than live at trial, we find no basis for any negative inference.

■ If an employee who is supposed to perform certain work for his employer steps or turns aside from his employer's work or business to serve some purpose of his own, unconnected with the employer's business, or if he deviates or departs from his work to accomplish some purpose of his own that is unconnected with his employment, the relationship of employer and employee or master and servant is thereby temporarily suspended. The master or employer is not liable for the acts of the servant or employee during the period of such suspension, because the employee is then acting upon his own volition, obeying his own will, not as a servant or agent, but as an independent person, even though he may intend and does return to his employer's business after he has accomplished the purpose of his detour from duty. In other words, where a servant or employee deviates from his line of duty and engages in a mission of his own, or from some third person, the master or employer cannot be held liable or responsible for the acts of the servant or employee. *See generally* 53 Am.Jur.2d *Master and Servant* § 430 (1970). *See also Nethery v. Hornbuckle*, 484 S.W.2d 542 (Tenn.App.M.S. 1971); *Averill v. Luttrell*, 44 Tenn.App. 56, 311 S.W.2d 812 (E.S.1957); *Cole v. Standard Oil Co. of New Jersey*, 29 Tenn.App. 449, 197 S.W.2d 13 (W.S.1946); *National Life & Accident Insurance Co. v. Morrison*, 179 Tenn. 29, 162 S.W.2d 501 (1942).

■ To render an employer liable for an employee's negligence while engaged partly in purposes of his own and partly in furtherance of the employer's business, the servant's actuation by the purpose of serving the employer's business must be more than that which is merely incidental, casual, technical, suppositional or argumentative. 53 Am.Jur.2d *Master and Servant* § 432 (1970).

■ So far as whether an employee was acting within the course and scope of his employment, the question to be determined is whether or not the act in which the employee was engaged at the time was a contemplated or foreseeable incident of his employment. Also, if the employer either could not or should not have reasonably foreseen and prevented the injurious occurrence, the employer cannot be held vicariously liable. 53 Am.Jur.2d *Master and Servant* § 434 (1970), citing *Tucker v. Home Stores*, 170 Tenn. 23, 91 S.W.2d 296 (1936).

■ The mere fact that on a trip in his own vehicle an employee either performs or intends to perform some act intended to produce a business benefit for his employer does not justify the conclusion that the driver is acting within the course and scope of his employment, where the business purpose in question is merely incidental to the primary purpose of the trip. 8 Am.Jur.2d *Automobiles and Highway Traffic* § 635 (1980).

*Goff v. St. Bernard Coal Company*, 174 Tenn. 558, 129 S.W.2d 205, involved an action against a corporation as a result of a child being struck by a truck owned by defendant and operated by one of its employees. The child was struck at a spot several blocks north of both defendant's place of business and any route its employee could have been expected to take to make any scheduled deliveries. The trial judge directed a defendant's verdict, and the court of appeals reversed. However, the supreme court reversed the court of appeals' decision and sustained the trial judge on the theory that the driver's deviation from duty was not, as a matter of law, in furtherance of his employer's business.

*Goff, supra*, is particularly relevant because, aside from the fact that the accident in question occurred on a Saturday and not during either defendant's or Mr. Potts' normal working hours or any other employee of Petty, Mr. Potts' extracurricular destination and the scene of the accident on that fatal Saturday were both *four miles* or more south of any location where dirt of any sort and in any way connected with defendant's project was to be transported, stored or otherwise used.

In *Nethery v. Hornbuckle, infra,* the plaintiff was the owner and operator of a

bulldozer on Hornbuckle's farm. As a result of work he was doing there, plaintiff had accumulated a considerable amount of trash and undertook unsuccessfully to burn it with diesel fuel. An employee of Benward, Inc., drove up in a truck owned by his corporate employer to tell plaintiff that a corporately owned vehicle had been parked on plaintiff's property with the consent of plaintiff's wife. The employee took advantage of the occasion to try to persuade plaintiff to hire Benward, Inc. to build a driveway for him. Without plaintiff's knowledge, the corporate employee poured gasoline on the trash in question, so that an explosion resulted when plaintiff again attempted to burn it, causing plaintiff serious injuries. A verdict was directed for Benward, Inc., and the court of appeals affirmed, explaining that the mere fact that the corporate employee may have undertaken to solicit plaintiff to do business with his corporate employer was insufficient to place his activities within the course and scope of his employment, making the distinction that solicitation of business was not part of the corporate employee's normal duties.

In another instance, where an automobile driver was an insurance agent trainee and struck plaintiff while in route to pick up a friend to accompany him to a hockey game and hoped to sell his friend a policy that night, but would have gone to the game even if his friend had been unable to attend, the driver was not acting within the course and scope of his employment at the time of the accident so as to render his employer vicariously liable. *Kelleher v. State Mutual Life Assurance Company,* 51 A.D.2d 872, 380 N.Y.S.2d 146 (1976).

With the background of his lucid case law and a record devoid of any corroboration in support of Potts' inconsistent testimony, we are unable to sustain the verdict based on that testimony.

Having concluded that there is no competent testimony to support the proposition that at the time of the accident on the fatal Saturday in question, that Mr. Potts' activities were authorized, permitted, known or ratified by defendant, we deal with the contention that such activities were a benefit to defendant by way of saving it money. We believe the theory of "benefit" to defendant is both factually and legally insufficient. Without contradiction, defendant was required, at the conclusion of its work in September, to expend time and money to remedy the dirt stockpile deficiency created in part by Mr. Potts' extracurricular activities in August. Thus, the efforts of Mr. Potts were not of ultimate benefit to the defendant. Further, as the above quoted authorities hold, incidental or collateral benefit to the master is insufficient to create the master-servant relationship not otherwise intended.

■ Finally, a plaintiff's verdict cannot be based on speculation, conjecture or guessing; a mere spark, glimmer or scintilla of evidence; or inferences based upon nor drawn from other inferences. *See Moon v. Johnston,* 47 Tenn.App. 208, 337 S.W.2d 464 (E.S.1959); *Preston v. Smith,* 41 Tenn.App. 222, 293 S.W.2d 51 (M.S.1955); *Gable v. Tennessee Liquefied Gas Company,* 45 Tenn.App. 674, 325 S.W.2d 657 (W.S. 1951); *Umstattd v. Metropolitan Life Insurance Co.,* 21 Tenn.App. 312, 110 S.W.2d 342 (E.S.1937); *General Outdoor Advertising Co. v. Coley,* 23 Tenn.App. 292, 131 S.W.2d 305 (W.S.1938); *Coca-Cola Bottling Co. v. Rowland,* 16 Tenn.App. 184, 66 S.W.2d 272 (W.S.1932).

■ Accordingly, the testimony of Potts having been impeached for all the reasons set forth above, and without the benefit of other credible evidence of agency sufficient to meet the requirements of law in this state, the ruling of the trial court was imminently correct. We affirm and dismiss as to the defendant Petty. Costs are assessed against the plaintiff.

AFFIRMED.

TODD, P.J., and LEWIS, J., concur.